**DANIEL R.R., Plaintiff–Appellant,**

**v.**

**STATE BOARD OF EDUCATION, et al., Defendants,**

**El Paso Independent School District, Defendant–Appellee.**

**No. 88–1279.**

United States Court of Appeals, Fifth Circuit.

June 12, 1989.

one ever contended that such a system was      lacking).

Reed Martin, Austin, Tex., for plaintiff-appellant.

Sam Sparks, El Paso, Tex., for defendants.

Steven L. Hughes, El Paso, Tex., for El Paso Independent School Dist.

Before THORNBERRY, GEE and POLITZ, Circuit Judges.

GEE, Circuit Judge:

Plaintiffs in this action, a handicapped boy and his parents, urge that a local school district failed to comply with the Education of the Handicapped Act.* Specifically, they maintain that a school district's refusal to place the child in a class with nonhandicapped students violates the Act. The district court disagreed and, after a careful review of the record, we affirm the district court.

## I. Background

### A. General

In 1975, on a finding that almost half of the handicapped children in the United States were receiving an inadequate education or none at all, Congress passed the Education of the Handicapped Act (EHA or Act). See 20 U.S.C.A. § 1400(b) (West 1988 Supp.); S.Rep. No. 168, 94th Cong., 1st Sess. 8 (1975), *reprinted in* 1975 U.S.Code Cong. & Admin.News 1425, 1432. Before passage of the Act, as the Supreme Court has noted, many handicapped children suffered under one of two equally ineffective approaches to their educational needs: either they were excluded entirely from public education or they were deposited in regular education classrooms with no assistance, left to fend for themselves in an environment inappropriate for their needs. *Hendrick Hudson District Board of Education v. Rowley*, 458 U.S. 176, 191, 102 S.Ct. 3034, 3043, 73 L.Ed.2d 690, 702 (1982) (citing H.R.Rep. No. 332, 94th Cong., 1st Sess. 2 (1975); S.Rep. No. 168, 94th Cong., 1st. Sess. 8 (1975) 1975 U.S.Code Cong. & Admin.News 1432). To entice state and local school officials to improve upon these inadequate methods of educating children with special needs, Congress created the EHA, having as its purpose providing handicapped children access to public education and requiring states to adopt procedures that will result in individualized consideration of and instruction for each handicapped child. *Id.* at 192, 102 S.Ct. at 3043, 73 L.Ed.2d at 703.

* In accordance with Court policy, this opinion, being one which initiates a conflict with the rule declared in another circuit, was circulated before release to the entire Court, and rehearing en banc was not voted by a majority of the judges in active service.

The Act is largely procedural. It mandates a "free appropriate public education" for each handicapped child and sets forth procedures designed to ensure that each child's education meets that requirement. 20 U.S.C.A. §§ 1412(1) and 1415(a)–(e). School officials are required to determine the appropriate placement for each child and must develop an Individualized Educational Plan (IEP) that tailors the child's education to his individual needs. The child's parents are involved at all stages of the process. *See generally* § 1415(b). In addition, the Act requires that handicapped children be educated in regular education classrooms, with nonhandicapped students —as opposed to special education classrooms with handicapped students only—to the greatest extent appropriate. § 1412(5)(B). Educating a handicapped child in a regular education classroom with nonhandicapped children is familiarly known as "mainstreaming," and the mainstreaming requirement is the source of the controversy between the parties before us today.

B. Particular

Daniel R. is a six year old boy who was enrolled, at the time this case arose, in the El Paso Independent School District (EPISD). A victim of Downs Syndrome, Daniel is mentally retarded and speech impaired. By September 1987, Daniel's developmental age was between two and three years and his communication skills were slightly less than those of a two year old.

In 1985, Daniel's parents, Mr. and Mrs. R., enrolled him in EPISD's Early Childhood Program, a half-day program devoted entirely to special education. Daniel completed one academic year in the Early Childhood Program. Before the 1986–87 school year began, Mrs. R. requested a new placement that would provide association with nonhandicapped children. Mrs. R. wanted EPISD to place Daniel in Pre-kindergarten—a half-day, regular education class. Mrs. R. conferred with Joan Norton, the Pre-kindergarten instructor, proposing that Daniel attend the half-day Pre-kindergarten class in addition to the half-day Early Childhood class. As a result, EP-

ISD's Admission, Review and Dismissal (ARD) Committee met and designated the combined regular and special education program as Daniel's placement.

This soon proved unwise, and not long into the school year Mrs. Norton began to have reservations about Daniel's presence in her class. Daniel did not participate without constant, individual attention from the teacher or her aide, and failed to master any of the skills Mrs. Norton was trying to teach her students. Modifying the Pre-kindergarten curriculum and her teaching methods sufficiently to reach Daniel would have required Mrs. Norton to modify the curriculum almost beyond recognition. In November 1986, the ARD Committee met again, concluded that Pre-kindergarten was inappropriate for Daniel, and decided to change Daniel's placement. Under the new placement, Daniel would attend only the special education, Early Childhood class; would eat lunch in the school cafeteria, with nonhandicapped children, three days a week if his mother was present to supervise him; and would have contact with nonhandicapped students during recess. Believing that the ARD had improperly shut the door to regular education for Daniel, Mr. and Mrs. R. exercised their right to a review of the ARD Committee's decision.

As the EHA requires, Mr. and Mrs. R. appealed to a hearing officer who upheld the ARD Committee's decision. *See* § 1415(b)(2). After a hearing which consumed five days of testimony and produced over 2500 pages of transcript, the hearing officer concluded that Daniel could not participate in the Pre-kindergarten class without constant attention from the instructor because the curriculum was beyond his abilities. In addition, the hearing officer found, Daniel was receiving little educational benefit from Pre-kindergarten and was disrupting the class—not in the ordinary sense of the term, but in the sense that his needs absorbed most of the teacher's time and diverted too much of her attention away from the rest of the class. Finally, the instructor would have to downgrade 90 to 100 percent of the Pre-kinder-

garten curriculum to bring it to a level that Daniel could master. Thus, the hearing officer concluded, the regular education, Pre-kindergarten class was not the appropriate placement for Daniel.

Dissatisfied with the hearing officer's decision, Mr. and Mrs. R. proceeded to the next level of review by filing this action in the district court. *See* § 1415(e). Although the EHA permits the parties to supplement the administrative record, Daniel's representatives declined to do so; and the court conducted its de novo review on the basis of the administrative record alone. The district court decided the case on cross motions for summary judgment. Relying primarily on Daniel's inability to receive an educational benefit in regular education, the district court affirmed the hearing officer's decision.

Mr. and Mrs. R. again appeal, but before we turn to the merits of the appeal we must pause to consider an issue that neither of the parties raised but which we must consider on our own initiative.

## II. *Mootness*

Two years passed while this case wound its way through the course of administrative and judicial review procedures. Several events that occurred during these two years might have rendered the case moot. First, the placement and IEP at issue today set forth Daniel's educational plan for the 1986–87 school year, one long past. Indeed, counsel informed us at oral argument that EPISD had reevaluated Daniel in May 1988, formulating a new IEP for the 1988–89 school year as a result. The placement and IEP upon which Daniel bases his claim have been or will, at the close of this litigation, be superseded. Second, we may hope that Daniel's development has not entirely stagnated while these proceedings have been pending, although the record does not contain the results of the May 1988 evaluation. We therefore cannot know how much Daniel has developed over the past two years, nor can we divine whether Daniel's development has rendered Pre-kindergarten any more or less appropriate for him now than

it was when EPISD reconsidered his placement. It may well be that neither Pre-kindergarten, nor Early Childhood, nor any mix of the two would be appropriate for Daniel at this time. Third, EPISD informed us at oral argument that Daniel is no longer enrolled in the Texas public school system. Dissatisfied with EPISD's 1988 evaluation and its 1988–89 IEP, Daniels' parents chose to send Daniel to a private school, where he remained as of the time of oral argument. Although neither of the parties raised the issue, these events force us to pause momentarily to consider whether the case continues to present a live case or controversy.

A case may circumvent the mootness doctrine if the conduct about which the plaintiff originally complained is "capable of repetition, yet evading review." *Honig v. Doe*, 484 U.S. 305, ——, 108 S.Ct. 592, 600, 98 L.Ed.2d 686, 703 (1988) (*quoting Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982)); *Valley Construction Co. v. Marsh*, 714 F.2d 26, 28 (5th Cir.1983) (*quoting Southern Pacific Terminal Co. v. I.C.C.*, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911)). Because there is a reasonable expectation that the conduct giving rise to this suit will recur every school year, yet evade review during the nine-month academic term, we conclude that the case is not moot.

Conduct is capable of repetition if there is a reasonable expectation or a demonstrated probability that the same controversy will recur. *Honig*, 484 U.S. at —— & n. 7, 108 S.Ct. at 603 & n. 7, 98 L.Ed.2d at 704 & n. 7 (citations omitted); *Valley Construction Co.*, 714 F.2d at 28. The conduct about which Daniel originally complained is EPISD's refusal to "mainstream" him. EPISD is unwilling to mainstream a child who cannot enjoy an academic benefit in regular education. Daniel's parents insist that EPISD must mainstream Daniel even if he cannot thrive academically in regular education. According to Mr. and Mrs. R. EPISD should mainstream Daniel solely to provide him with the company of nonhandicapped students. Each side of this controversy steadfastly adheres to its perception of the EHA's mainstreaming requirement.

Given the parties' irreconcilable views on the issue, whether and to what extent to mainstream Daniel will be an issue every time EPISD prepares a new placement or IEP or proposes to change an existing one. The parties have a reasonable expectation of confronting this controversy every year that Daniel is eligible for public education.

Neither the expiration of the 1986–87 IEP, nor Daniel's development over the past two years, nor the new IEP change our conclusion. Certainly, the controversy whether the 1986–87 placement and IEP comply with the EHA's mainstreaming requirement is not likely to recur. The primary controversy, however, is the extent of EPISD's mainstreaming obligation, a controversy that is reasonably likely to recur as Daniel develops and as EPISD prepares placements and IEPs for each new school year. Nor does Mr. and Mrs. R.'s recent decision to remove Daniel from the EPISD, system render the case moot. Although Daniel no longer attends public school, he remains a citizen of the State of Texas and, thus, remains entitled to a free appropriate public education in the state. Given Daniel's continued eligibility for public educational services under the EHA, the mainstreaming controversy remains capable of repetition. *See Honig,* 484 U.S. at —— ——, 108 S.Ct. at 602–03, 98 L.Ed.2d at 703–04.

This recurring controversy will evade review during the effective period of each IEP. A placement and an IEP cover an academic year, a nine month period. The Supreme Court has observed that administrative and judicial review of an IEP is "ponderous" and usually will not be complete until a year after the IEP has expired. *School Committee of the Town of Burlington v. Department of Education of the Commonwealth of Massachusetts,* 471 U.S. 359, 370, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385, 395 (1985); *see Rowley,* 458 U.S. at 186 n. 9, 102 S.Ct. at 3041 n. 9, 73 L.Ed.2d at 699 n. 9 (noting that judicial and administrative review of an IEP "invariably" takes. more than nine months.). In *Rowley,* the Court held that the controversy was capable of repetition yet evading review even though the IEP should have expired two years before the case reached the court. *Rowley,* 458 U.S. at 186 n. 9, 102 S.Ct. at 3041 n. 9, 73 L.Ed.2d at 699 n. 9. Here, Daniel exhausted his state administrative remedies and, then, filed suit in the district court. The ponderous administrative and judicial review did, as the Court predicted, outlive Daniel's placement and IEP, allowing them to evade review. As the case presents a live controversy, we turn to the merits of Daniel's appeal.

### III. *Procedural Violations*

At the heart of the EHA lie detailed procedural provisions, processes designed to guarantee that each handicapped student's education is tailored to his unique needs and abilities. The EHA, and the regulations promulgated pursuant to it, contain procedures for determining whether the appropriate placement is regular or special education, for preparing an IEP once the child is placed, for changing the placement or the IEP, and for removing the child from regular education. 20 U.S.C.A. §§ 1412 and 1415; 34 C.F.R. §§ 300.300—300.576 (1986). The Act's procedural guarantees are not mere procedural hoops through which Congress wanted state and local educational agencies to jump. Rather, "the formality of the Act's procedures is itself a safeguard against arbitrary or erroneous decisionmaking." *Jackson v. Franklin County School Board,* 806 F.2d 623, 630 (5th Cir.1986).[1] Indeed, a violation of the EHA's procedural guarantees may be a sufficient ground for holding that a school system has failed to provide a free appropriate public education and, thus, has violated the Act. *Id.* at 629; *Hall v. Vance County Board of Education,* 774 F.2d 629, 635 (4th Cir.1985). Daniel raises five

1. Contrasting the Act's "elaborate and highly specific procedural safeguards" with its "general and somewhat imprecise substantive admonitions," the Supreme Court found a "legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Rowley,* 458 U.S. at 205–06, 102 S.Ct. at 3050, 73 L.Ed.2d at 711–12.

1042

claims of procedural error, each without merit.

■ First, Daniel contends that EPISD failed to give proper notice of a proposed change in his IEP, an assertion that misconstrues the nature of EPISD's proposed action. The regulations that implement the EHA require school officials to give written notice before "propos[ing] to ... change the identification, evaluation or educational placement of the child ..." 34 C.F.R. § 300.504(a)(1) (1986). The regulations also prescribe the content of the notice: it must include "a description of the action proposed or refused by the agency, an explanation of why the agency proposes or refuses to take the action, and a description of any options the agency considered and the reasons why those options were rejected." *Id.* § 300.505(a)(1). Daniel complains that EPISD did not provide notice that it proposed to change his IEP and that the notice which EPISD did provide stated that it would *not* change the IEP. Although Daniel's description of the notice is accurate, his conclusion that the notice does not conform to the EHA's regulations is incorrect.

The notice that EPISD sent to Daniel's parents apprised them of the precise action which EPISD proposed to take: a change in Daniel's placement. Daniel's placement was a mixed regular and special education program, with time allocated approximately equally between the two environments. Daniel's IEP, in contrast, outlined his needs and goals for the academic year; simply, it was a list of what EPISD and Daniel's parents hoped Daniel would achieve. EPISD did not propose merely to alter Daniel's IEP, scaling back its expectations or altering its objectives for Daniel's progress. Instead, EPISD proposed the more drastic step of removing Daniel from the regular education class, thus changing his placement. The notice that EPISD provided accurately informed Mr. and Mrs. R.

of EPISD's proposal. EPISD sent Mrs. R. its form "Notice of Admission, Review and Dismissal (ARD) Committee Meeting." On the notice form, EPISD indicated that it would review Daniel's progress, that it would "consider the appropriate educational placement," and that the options it was considering included a regular classroom and a self-contained classroom.[2] Thus, EPISD's notice adequately warned Mr. and Mrs. R. that the appropriate placement for their son was at issue and that EPISD was considering placing Daniel in a self-contained classroom.

EPISD did indicate, as Daniel contends, that it was not considering a change in Daniel's IEP. EPISD's explanation of its plans did not, however, mislead Mr. and Mrs. R. or fail to give notice of EPISD's proposal. EPISD did not propose to change Daniel's IEP. Indeed, an indication on the notice form that EPISD proposed to alter the IEP could have been misleading. As the notice form accurately notified Mr. and Mrs. R. of the proposed change in placement, we find no procedural defect in EPISD's notice.

■ Second, ignoring the events surrounding EPISD's decision, Daniel complains that EPISD did not evaluate him before removing him from regular education. According to Daniel, school officials must reevaluate a handicapped student before removing him from regular education. *See* 34 C.F.R. § 104.35(a).[3] EPISD's failure to evaluate Daniel does not constitute a reason to reverse this case. In the "Stipulations and Agreements" submitted to the hearing officer, Daniel stated that he did not contest EPISD's current evaluation. Furthermore, Daniel's parents refused to consent to a new evaluation because they felt it was not necessary. When a student and his parents agree with the school's current evaluation and refuse a new evaluation, they can scarcely be

2. Generally, a class that is devoted entirely to special education is a "self-contained" classroom.

3. We note in passing that the regulation to which Daniel refers us is one promulgated un-

der the Rehabilitation Act of 1973. Given our disposition of this issue, we need not delve into the relationship between the Rehabilitation Act and the EHA or the effect of a violation of one of the Rehabilitation Act's regulations.

heard to complain of a procedural violation based upon the school's failure to conduct a new evaluation.

■ Third, Daniel asserts that EPISD failed to provide a continuum of educational services. The EHA's regulations require school officials to "insure that a continuum of alternative placements is available to meet the needs of handicapped children for special education and related services." 34 C.F.R. § 300.551(a). The continuum must include alternative placements and supplementary services in conjunction with regular class placement. *Id.* § 300.551(b). In its effort to find the appropriate placement for Daniel, EPISD experimented with a variety of alternative placements and supplementary services. First, EPISD attempted a mixed placement that allocated Daniel's time equally between regular and special education. The regular education instructor attempted to modify and supplement the regular education curriculum to meet Daniel's needs. When EPISD concluded that Daniel was not thriving in this environment, it proposed a different combination of educational experiences. Under the new plan, Daniel would spend all of his academic time in special education but would mix with nonhandicapped children during lunch and recess. EPISD has provided a continuum of alternative placements and has demonstrated an admirable willingness to experiment with and to adjust Daniel's placement to arrive at the appropriate mix of educational environments.

■ Fourth, Daniel maintains that EPISD removed him from the regular classroom for disciplinary reasons but failed to follow the EHA's procedure for removals based on disciplinary problems. Again, Daniel has misconstrued the events leading to this appeal. The hearing officer found that

> [w]hile there is no evidence that Daniel's behavior in Pre-kindergarten is disruptive in the ordinary sense of the term, it is obvious that the amount of attention he requires is, nevertheless, disruptive by so absorbing the efforts and energy

of the staff as to impair the quality of the entire program for the other children.

This finding in no way reflects a disciplinary problem. Thus, EPISD's decision to remove Daniel from regular education did not trigger the EHA's disciplinary procedures.

■ Finally, Daniel suggests that EPISD did not follow the EHA's procedure for removing a child from regular education. The EHA provides that a child shall be removed from a regular classroom only if education in the regular classroom, with the use of supplementary aids and services, cannot be achieved satisfactorily. § 1412(5)(B). According to Daniel, EPISD never attempted to use any supplementary aids and services in Pre-kindergarten and, thus, cannot demonstrate that education in the regular classroom cannot be achieved satisfactorily. Daniel misunderstands the nature of this issue; it relates to the substantive question whether and to what extent Daniel should be mainstreamed, not to the procedural requirements of the EHA. Moreover, even if this were a procedural question, EPISD met the requirement of providing supplementary aids and services. The record indicates that the Pre-kindergarten teacher made genuine efforts to modify and supplement her teaching program to reach Daniel. Unfortunately, even with the teacher's assistance, Daniel could not thrive in regular education. As we find no merit to Daniel's claims of procedural error, we turn to his substantive claims.

## IV. *Substantive Violations*

### A. Mainstreaming Under the EHA

The cornerstone of the EHA is the "free appropriate public education." As a condition of receiving federal funds, states must have "in effect a policy that assures all handicapped children the right to a free appropriate public education." § 1412(1). The Act defines a free appropriate public education in broad, general terms without dictating substantive educational policy or mandating specific educational methods.[4]

---

4. The EHA defines a free appropriate public education as "special education and related ser-

In *Rowley*, the Supreme Court fleshed out the Act's skeletal definition of its principal term: "a 'free appropriate public education' consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Rowley*, 458 U.S. at 188–89, 102 S.Ct. at 3042, 73 L.Ed.2d at 701. The Court's interpretation of the Act's language does not, however, add substance to the Act's vague terms; instruction specially designed to meet each student's unique needs is as imprecise a directive as the language actually found in the Act.

The imprecise nature of the EHA's mandate does not reflect legislative omission. Rather, it reflects two deliberate legislative decisions. Congress chose to leave the selection of educational policy and methods where they traditionally have resided—with state and local school officials. *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051, 73 L.Ed.2d at 712–13. In addition, Congress's goal was to bring handicapped children into the public school system and to provide them with an education tailored to meet their particular needs. *Id.* at 189, 102 S.Ct. at 3042, 73 L.Ed.2d at 701. Such needs span the spectrum of mental and physical handicaps, with no two children necessarily suffering the same condition or requiring the same services or education. *Id.* at 189, 102 S.Ct. at 3042, 73 L.Ed.2d at 701. Schools must retain significant flexibility in educational planning if they truly are to address each child's needs. A congressional mandate that dictates the substance of educational programs, policies and methods would deprive school officials of the flexibility so important to their tasks. Ultimately, the Act mandates an education for each handicapped child that is responsive to his needs, but leaves the substance and the details of that education to state and local school officials.

In contrast to the EHA's vague mandate for a free appropriate public education lies one very specific directive prescribing the educational environment for handicapped children. Each state must establish

procedures to assure that, to the maximum extent appropriate, handicapped children ... are educated with children who are not handicapped, and that special education, separate schooling or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

§ 1412(5)(B). With this provision, Congress created a strong preference in favor of mainstreaming. *Lachman v. Illinois State Board of Education*, 852 F.2d 290, 295 (7th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988); *A.W. v. Northwest R–1 School District*, 813 F.2d 158, 162 (8th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 144, 98 L.Ed.2d 100 (1987); *Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir.), *cert. denied*, 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983).

By creating a statutory preference for mainstreaming, Congress also created a tension between two provisions of the Act. School districts must both seek to mainstream handicapped children and, at the same time, must tailor each child's educational placement and program to his special needs. §§ 1412(1) and (5)(B). Regular classes, however, will not provide an education that accounts for each child's particular needs in every case. The nature or severity of some children's handicaps is such that only special education can address their needs. For these children, mainstreaming does not provide an education designed to meet their unique needs and, thus, does not provide a free appropriate public education. As a result, we cannot evaluate in the abstract whether a chal-

vices which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or

secondary school education in the state involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title." § 1401(18).

lenged placement meets the EHA's mainstreaming requirement. "Rather, that laudable policy objective must be weighed in tandem with the Act's principal goal of ensuring that the public schools provide handicapped children with a free appropriate public education." *Lachman,* 852 F.2d at 299; *Wilson v. Marana Unified School District,* 735 F.2d 1178, 1183 (9th Cir.1984) (citations omitted).

■ Although Congress preferred education in the regular education environment, it also recognized that regular education is not a suitable setting for educating many handicapped children. *Rowley,* 458 U.S. at 181 n. 4, 102 S.Ct. at 3038 n. 4, 73 L.Ed.2d at 696 n. 4; *Lachman,* 852 F.2d at 295. Thus, the EHA allows school officials to remove a handicapped child from regular education or to provide special education if they cannot educate the child satisfactorily in the regular classroom. § 1412(5)(B). Even when school officials can mainstream the child, they need not provide for an exclusively mainstreamed environment; the Act requires school officials to mainstream each child only to the maximum extent appropriate. *Id.* In short, the Act's mandate for a free appropriate public education qualifies and limits its mandate for education in the regular classroom. Schools must provide a free appropriate public education and must do so, to the maximum extent appropriate, in regular education classrooms. But when education in a regular classroom cannot meet the handicapped child's unique needs, the presumption in favor of mainstreaming is overcome and the school need not place the child in regular education. *See Lachman,* 852 F.2d at 295; *A.W.,* 813 F.2d at 163; *Roncker,* 700 F.2d at 1063. The Act does not, however, provide any substantive standards for striking the proper balance between its requirement for mainstreaming and its mandate for a free appropriate public education.

B. Determining Compliance With the Mainstreaming Requirement

Determining the contours of the mainstreaming requirement is a question of first impression for us. In the seminal interpretation of the EHA, the Supreme Court posited a two-part test for determining whether a school has provided a free appropriate public education: "First, has the State complied with the procedures set forth in the Act. And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits." *Rowley,* 458 U.S. at 206–07, 102 S.Ct. at 3051, 73 L.Ed.2d at 712 (footnotes omitted). Despite the attractive ease of this two part inquiry, it is not the appropriate tool for determining whether a school district has met its mainstreaming obligations. In *Rowley,* the handicapped student was placed in a regular education class; the EHA's mainstreaming requirement was not an issue presented for the Court's consideration. Indeed, the Court carefully limited its decision to the facts before it, noting that it was not establishing a single test that would determine "the adequacy of educational benefits conferred upon all children covered by the Act." *Id.* at 202, 102 S.Ct. at 3049, 73 L.Ed.2d at 709. Faced with the same issue we face today, both the Sixth and the Eighth Circuit concluded that the *Rowley* test was not intended to decide mainstreaming issues. *A.W.,* 813 F.2d at 163; *Roncker,* 700 F.2d at 1063. Moreover, both Circuits noted that the *Rowley* Court's analysis is ill suited for evaluating compliance with the mainstreaming requirement. *A.W.,* 813 F.2d at 163; *Roncker,* 700 F.2d at 1062. As the Eighth Circuit explained, the *Rowley* test assumes that the state has met all of the requirements of the Act, including the mainstreaming requirement. *A.W.,* 813 F.2d at 163 n. 7 (citations omitted). The *Rowley* test thus assumes the answer to the question presented in a mainstreaming case. Given the *Rowley* Court's express limitation on its own opinion, we must agree with the Sixth and Eighth Circuits that the *Rowley* test does not advance our inquiry when the question presented is whether the Act's mainstreaming requirement has been met.

Although we have not yet developed a standard for evaluating mainstreaming

questions, we decline to adopt the approach that other circuits have taken. In *Roncker*, visiting the same question which we address today, the Sixth Circuit devised its own test to determine when and to what extent a handicapped child must be mainstreamed. According to the *Roncker* court,

> [t]he proper inquiry is whether a proposed placement is appropriate under the Act.... In a case where the segregated facility is considered superior, the court should determine whether the services which make that placement superior could be feasibly provided in a non-segregated setting. If they can, the placement in the segregated school would be inappropriate under the Act.

*Roncker*, 700 F.2d at 1063 (citation and footnote omitted); *accord, A.W.*, 813 F.2d at 163.[5] We respectfully decline to follow the Sixth Circuit's analysis. Certainly, the *Roncker* test accounts for factors that are important in any mainstreaming case. We believe, however, that the test necessitates too intrusive an inquiry into the educational policy choices that Congress deliberately left to state and local school officials. Whether a particular service feasibly can be provided in a regular or special education setting is an administrative determination that state and local school officials are far better qualified and situated than are we to make. Moreover, the test makes little reference to the language of the EHA. Yet, as we shall see, we believe that the language of the Act itself provides a workable test for determining whether a state has complied with the Act's mainstreaming requirement.

Nor do we find the district court's approach to the issue the proper tool for analyzing the mainstreaming obligation. Relying primarily on whether Daniel could receive an educational benefit from regular education, the district court held that the special education class was the appropriate placement for Daniel. According to the court, "some children, even aided by supplemental aids and services in a regular education classroom, will never receive an educational benefit that approximates the level of skill and comprehension acquisition of nonhandicapped children." In these cases, regular education does not provide the child an appropriate education and the presumption in favor of mainstreaming is overcome. As no aspect of the Pre-kindergarten curriculum was within Daniel's reach, EPISD was not required to mainstream him.[6] Given the nature and severity of Daniel's handicap at the time EPISD placed him, we agree with the district court's conclusion that EPISD was not required to mainstream Daniel. We disagree, however, with the court's analysis of the mainstreaming issue, finding it troublesome for two reasons: first, as a prerequisite to mainstreaming, the court would require handicapped children to learn at approximately the same level as their nonhandicapped classmates. Second, the court places too much emphasis on the handicapped student's ability to achieve an educational benefit.

First, requiring as a prerequisite to mainstreaming that the handicapped child be able to learn at approximately the same level as his nonhandicapped classmates fails to take into account the principles that the Supreme Court announced in *Rowley*. Our public school system tolerates a wide range of differing learning abilities; at the same time, it provides educational opportunities that do not necessarily account for all of those different capacities to learn. As the *Rowley* Court noted, "[t]he educational opportunities provided by our public school systems undoubtedly differ from student to student, depending upon a myriad of factors that might affect a particular student's ability to assimilate information presented in the classroom." *Rowley*, 458

---

5. When the court conducts this inquiry, it may consider cost and the handicapped child's educational progress. *Roncker*, 700 F.2d at 163 (citation omitted). It appears that the court also should compare the benefits the child would receive in special education to the benefits he would receive in regular education. *Id.*

6. In addition, it was relevant to the court, but not dispositive, that Daniel's presence in the regular classroom was disruptive in that he required too much of the teacher's attention.

U.S. at 198, 102 S.Ct. at 3047, 73 L.Ed.2d at 707.

With the EHA, Congress extended the states' tolerance of educational differences to include tolerance of many handicapped children. States must accept in their public schools children whose abilities and needs differ from those of the average student. Moreover, some of those students' abilities are vastly different from those of their nonhandicapped peers:

[t]he Act requires participating states to educate a wide spectrum of handicapped children, from the marginally hearing impaired to the profoundly retarded and palsied. It is clear that the benefits obtainable by children at one end of the spectrum will differ dramatically from those obtainable by children at the other end, with infinite variations in between. One child may have little difficulty competing successfully with nonhandicapped children while another child may encounter great difficulty in acquiring even the most basic of self maintenance skills.

*Rowley*, 458 U.S. at 202, 102 S.Ct. at 3048, 73 L.Ed.2d at 709. The *Rowley* court rejected the notion that the EHA requires states to provide handicapped children with educational opportunities that are equal to those provided to nonhandicapped students. *Id.* at 189, 102 S.Ct. at 3042, 73 L.Ed.2d at 707. Thus, the Court recognized that the Act draws handicapped children into the regular education environment but, in the nature of things, cannot always offer them the same educational opportunities that regular education offers nonhandicapped children. States must tolerate educational differences; they need not perform the impossible: erase those differences by taking steps to equalize educational opportunities. As a result, the Act accepts the notion that handicapped students will participate in regular education but that some of them will not benefit as much as nonhandicapped students will. The Act requires states to tolerate a wide range of educational abilities in their schools and, specifically, in regular education—the EHA's preferred educational environment. Given the tolerance embodied in the EHA, we cannot predicate access to regular education on a child's ability to perform on par with nonhandicapped children.[7]

We recognize that some handicapped children may not be able to master as much of the regular education curriculum as their nonhandicapped classmates. This does not mean, however, that those handicapped children are not receiving any benefit from regular education. Nor does it mean that they are not receiving all of the benefit that their handicapping condition will permit. If the child's individual needs make mainstreaming appropriate, we cannot deny the child access to regular education simply because his educational achievement lags behind that of his classmates.

Second, the district court placed too much emphasis on educational benefits.[8] Certainly, whether a child will benefit educationally from regular education is relevant and important to our analysis. Congress's primary purpose in enacting the EHA was to provide access to education for handicapped children. *Rowley*, 458 U.S. at 192, 193 n. 15, 102 S.Ct. at 3043, 3044 n. 15, 73 L.Ed.2d at 703, 704 n. 15. Implicit in Congress's purpose to provide access is a purpose to provide meaningful access, access that is sufficient to confer some educational benefit on the child. *Id.* at 200, 102 S.Ct. at 3047, 73 L.Ed.2d at 708. Thus, the decision whether to mainstream a child must include an inquiry into whether the student will gain any educational benefit from regular education. Our analysis cannot stop here, however, for educational benefits are not mainstreaming's only virtue. Rather, mainstreaming may have benefits in and of itself. For example, the

---

7. We emphasize, however, that school officials are not obligated to mainstream every handicapped child without regard for whether the regular classroom provides a free appropriate public education.

8. As we use the term "educational benefits" here, we, like the hearing officer and the district court, refer to the academic benefits available through education—as opposed to the overall growth and development benefits gained from education.

language and behavior models available from nonhandicapped children may be essential or helpful to the handicapped child's development. In other words, although a handicapped child may not be able to absorb all of the regular education curriculum, he may benefit from nonacademic experiences in the regular education environment. As the Sixth Circuit explained "[i]n some cases, a placement which may be considered better for academic reasons may not be appropriate because of the failure to provide for mainstreaming." *Roncker*, 700 F.2d at 1063. As we are not comfortable with the district court or the Sixth Circuit's approach to the mainstreaming question, we return to the text of the EHA for guidance.

■ Ultimately, our task is to balance competing requirements of the EHA's dual mandate: a free appropriate public education that is provided, to the maximum extent appropriate, in the regular education classroom. As we begin our task we must keep in mind that Congress left the choice of educational policies and methods where it properly belongs—in the hands of state and local school officials. Our task is not to second-guess state and local policy decisions; rather, it is the narrow one of determining whether state and local school officials have complied with the Act. Adhering to the language of the EHA, we discern a two part test for determining compliance with the mainstreaming requirement. First, we ask whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child. *See* § 1412(5)(B). If it cannot and the school intends to provide special education or to remove the child from regular education, we ask, second, whether the school has mainstreamed the child to the maximum extent appropriate. *See id.* A variety of factors will inform each stage of our inquiry; the factors that we consider today do not constitute an exhaustive list of factors relevant to the mainstreaming issue. Moreover, no single factor is dispositive in all cases. Rather, our analysis is an individualized, fact-specific inquiry that requires us to examine carefully the nature and severity of the child's handicapping condition, his needs and abilities, and the schools' response to the child's needs.

■ In this case, several factors assist the first stage of our inquiry, whether EPISD can achieve education in the regular classroom satisfactorily. At the outset, we must examine whether the state has taken steps to accommodate the handicapped child in regular education. The Act requires states to provide supplementary aids and services and to modify the regular education program when they mainstream handicapped children. *See* § 1401(17), (18), § 1412(5)(B); *Rowley*, 458 U.S. at 189, 102 S.Ct. at 3042, 73 L.Ed.2d at 701; 34 C.F.R. Part 300, App. C Question 48; *see also* Tex.Admin.Code Tit. 19 § 89.223(a)(4)(C). If the state has made no effort to take such accommodating steps, our inquiry ends, for the state is in violation of the Act's express mandate to supplement and modify regular education. If the state is providing supplementary aids and services and is modifying its regular education program, we must examine whether its efforts are sufficient. The Act does not permit states to make mere token gestures to accommodate handicapped students; its requirement for modifying and supplementing regular education is broad. *See* 34 C.F.R. Part 300, App. C Question 48; *see, e.g., Irving Independent School District v. Tatro*, 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984). Indeed, Texas expressly requires its local school districts to modify their regular education program when necessary to accommodate a handicapped child. Tex.Admin.Code Tit. 19 § 89.223(a)(4)(C).

■ Although broad, the requirement is not limitless. States need not provide every conceivable supplementary aid or service to assist the child. *See generally Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690. Furthermore, the Act does not require regular education instructors to devote all or most of their time to one handicapped child or to modify the regular education program beyond recognition. If a regular education instructor must devote all of her time to one handicapped child,

she will be acting as a special education teacher in a regular education classroom. Moreover, she will be focusing her attentions on one child to the detriment of her entire class, including, perhaps, other, equally deserving, handicapped children who also may require extra attention. Likewise, mainstreaming would be pointless if we forced instructors to modify the regular education curriculum to the extent that the handicapped child is not required to learn any of the skills normally taught in regular education. The child would be receiving special education instruction in the regular education classroom; the only advantage to such an arrangement would be that the child is sitting next to a nonhandicapped student.[9]

Next, we examine whether the child will receive an educational benefit from regular education. This inquiry necessarily will focus on the student's ability to grasp the essential elements of the regular education curriculum. Thus, we must pay close attention to the nature and severity of the child's handicap as well as to the curriculum and goals of the regular education class. For example, if the goal of a particular program is enhancing the child's development, as opposed to teaching him specific subjects such as reading or mathematics, our inquiry must focus on the child's ability to benefit from the developmental lessons, not exclusively on his potential for learning to read. We reiterate, however, that academic achievement is not the only purpose of mainstreaming. Integrating a handicapped child into a nonhandicapped environment may be beneficial in and of itself. Thus, our inquiry must extend beyond the educational benefits that the child may receive in regular education.

We also must examine the child's overall educational experience in the mainstreamed environment, balancing the benefits of regular and special education for each individual child. For example, a child may be able to absorb only a minimal amount of the regular education program, but may benefit enormously from the language models that his nonhandicapped peers provide for him. In such a case, the benefit that the child receives from mainstreaming may tip the balance in favor of mainstreaming, even if the child cannot flourish academically. *Roncker*, 700 F.2d at 1063. On the other hand, placing a child in regular education may be detrimental to the child. In such a case, mainstreaming would not provide an education that is attuned to the child's unique needs and would not be required under the Act. Indeed, mainstreaming a child who will suffer from the experience would violate the Act's mandate for a free appropriate public education.

Finally, we ask what effect the handicapped child's presence has on the regular classroom environment and, thus, on the education that the other students are receiving. A handicapped child's placement in regular education may prove troublesome for two reasons. First, the handicapped child may, as a result of his handicap, engage in disruptive behavior. " '[W]here a handicapped child is so disruptive in a regular classroom that the education of other students is significantly impaired, the needs of the handicapped child cannot be met in that environment. Therefore regular placement would not be appropriate to his or her needs.' " 34 C.F.R. § 300.552 Comment (quoting 34 CFR Part 104—Appendix, Paragraph 24) Second, the child may require so much of the instructor's attention that the instructor will have to ignore the other student's needs in order to tend to the handicapped child. The Act and its regulations mandate that the school provide supplementary aids and services in the regular education classroom. A teaching assistant or an aide may minimize the burden on the teacher. If, however, the handicapped child requires so much of the teacher or the aide's time that the rest of the class suffers, then the balance will tip

**9.** The Sixth Circuit has concluded that, in a limited fashion, cost is a relevant factor in determining compliance with the mainstreaming requirement. *Roncker*, 700 F.2d at 1063 (citing *Age v. Bullitt County Schools*, 673 F.2d 141, 145 (6th Cir.1982)). As neither of the parties has raised cost as an issue, we need not consider whether the cost of a supplementary aid or service is a relevant factor.

in favor of placing the child in special education.

If we determine that education in the regular classroom cannot be achieved satisfactorily, we next ask whether the child has been mainstreamed to the maximum extent appropriate. The EHA and its regulations do not contemplate an all-or-nothing educational system in which handicapped children attend either regular or special education. Rather, the Act and its regulations require schools to offer a continuum of services. 34 C.F.R. § 300.551; *Lachman*, 852 F.2d at 296 n. 7 (citing *Wilson v. Marana School District No. 6 of Pima County*, 735 F.2d 1178, 1183 (9th Cir. 1984)). Thus, the school must take intermediate steps where appropriate, such as placing the child in regular education for some academic classes and in special education for others, mainstreaming the child for nonacademic classes only,[10] or providing interaction with nonhandicapped children during lunch and recess. The appropriate mix will vary from child to child and, it may be hoped, from school year to school year as the child develops. If the school officials have provided the maximum appropriate exposure to non-handicapped students, they have fulfilled their obligation under the EHA.

### C.  EPISD's Compliance with the Mainstreaming Requirement

■ After a careful review of the voluminous administrative record, we must agree with the trial court that EPISD's decision to remove Daniel from regular education does not run afoul of the EHA's preference for mainstreaming. Accounting for all of the factors we have identified today, we find that EPISD cannot educate Daniel satisfactorily in the regular education classroom. Furthermore, EPISD has taken creative steps to provide Daniel as much access to nonhandicapped students as it can, while providing him an education that is tailored to his unique needs. Thus, EPISD has mainstreamed Daniel to the maximum extent appropriate.

EPISD cannot educate Daniel satisfactorily in the regular education classroom; each of the factors we identified today counsels against placing Daniel in regular education. First, EPISD took steps to modify the Pre-kindergarten program and to provide supplementary aids and services for Daniel—all of which constitute a sufficient effort. Daniel contends that EPISD took no such steps and that, as a result, we can never know whether Daniel could have been educated in a regular classroom. Daniel's assertion is not supported by the record. The Pre-kindergarten teacher made genuine and creative efforts to reach Daniel, devoting a substantial—indeed, a disproportionate—amount of her time to him and modifying the class curriculum to meet his abilities. Unfortunately, Daniel's needs commanded most of the Pre-kindergarten instructor's time and diverted much of her attention away from the rest of her students. Furthermore, the instructor's efforts to modify the Pre-kindergarten curriculum produced few benefits to Daniel. Indeed, she would have to alter 90 to 100 percent of the curriculum to tailor it to Daniel's abilities. Such an effort would modify the curriculum beyond recognition, an effort which we will not require in the name of mainstreaming.

Second, Daniel receives little, if any, educational benefit in Pre-kindergarten. Dr. Bonnie Fairall, EPISD's Director of Special Education, testified that the Pre-kindergarten curriculum is "developmental in nature; communication skills, gross motor [skills]" and the like. The curriculum in Kindergarten and other grades is an academic program; the developmental skills taught in Pre-kindergarten are essential to success in the academic classes. Daniel's handicap has slowed his development so that he is not yet ready to learn the developmental skills offered in Pre-kindergarten. Daniel does not participate in class activities; he cannot master most or all of the lessons taught in the class. Very simply, Pre-kindergarten offers Daniel nothing but an opportunity to associate with nonhandicapped students.

---

**10.**  Nonacademic classes may include art, music or physical education.

Third, Daniel's overall educational experience has not been entirely beneficial. As we explained, Daniel can grasp little of the Pre-kindergarten curriculum; the only value of regular education for Daniel is the interaction which he has with nonhandicapped students. Daniel asserts that the opportunity for interaction, alone, is a sufficient ground for mainstreaming him. When we balance the benefits of regular education against those of special education, we cannot agree that the opportunity for Daniel to interact with nonhandicapped students is a sufficient ground for mainstreaming him. Regular education not only offers Daniel little in the way of academic or other benefits, it also may be harming him. When Daniel was placed in Pre-kindergarten, he attended school for a full day; both Pre-kindergarten and Early Childhood were half-day classes. The experts who testified before the hearing officer indicated that the full day program is too strenuous for a child with Daniel's condition. Simply put, Daniel is exhausted and, as a result, he sometimes falls asleep at school. Moreover, the record indicates that the stress of regular education may be causing Daniel to develop a stutter. Special education, on the other hand, is an educational environment in which Daniel is making progress. Balancing the benefits of a program that is only marginally beneficial and is somewhat detrimental against the benefits of a program that is clearly beneficial, we must agree that the beneficial program provides the more appropriate placement.

Finally, we agree that Daniel's presence in regular Pre-kindergarten is unfair to the rest of the class. When Daniel is in the Pre-kindergarten classroom, the instructor must devote all or most of her time to Daniel. Yet she has a classroom filled with other, equally deserving students who need her attention. Although regular education instructors must devote extra attention to their handicapped students, we will not require them to do so at the expense of their entire class.

Alone, each of the factors that we have reviewed suggests that EPISD cannot educate Daniel satisfactorily in the regular education classroom. Together, they clearly tip the balance in favor of placing Daniel in special education. Thus, we turn to the next phase of our inquiry and conclude that EPISD has mainstreamed Daniel to the maximum extent appropriate. Finding that a placement that allocates Daniel's time equally between regular and special education is not appropriate, EPISD has taken the intermediate step of mainstreaming Daniel for lunch and recess. This opportunity for association with nonhandicapped students is not as extensive as Daniel's parents would like. It is, however, an appropriate step that may help to prepare Daniel for regular education in the future. As education in the regular classroom, with the use of supplementary aids and services cannot be achieved satisfactorily, and as EPISD has placed Daniel with nonhandicapped students to the maximum extent appropriate, we affirm the district court.

## V. *EPISD's Request for Sanctions*

EPISD requests that we sanction Daniel's parents and his counsel for bringing a frivolous appeal, a course we decline to take. *See* Fed.R.App.P. 38. EPISD alleges that Mr. and Mrs. R. brought this appeal and engaged in delay tactics for one purpose: to keep Daniel in the Pre-kindergarten program for as long as possible.[11] Furthermore, EPISD asserts, the record does not contain any evidence that would support Mr. and Mrs. R.'s position. We cannot agree that Mr. and Mrs. R., or their attorney, deserve sanctions. The record does not indicate that Mr. and Mrs. R. exercised their right to appellate review for improper purposes. Absent any evidence, we refuse to attribute an improper motive to a parent seeking to provide for his child. Moreover, our circuit had not yet considered the issue presented in this case when Mr. and Mrs. R. brought their appeal. Finally, as the district court explained when it rejected EPISD's request for Rule

11. When a parent challenges a placement under the EHA, the child remains in the "status quo" during the pendency of the appellate process.

§ 1415(e)(3). Thus, Daniel has remained in Pre-kindergarten during the two years that this case has meandered through the review process.

11 sanctions, Mr. and Mrs. R. and their counsel "were strong advocates of a position they held in good faith arguing for an extension of the presumption contained in the EHA for mainstreaming handicapped youth[s] to the case at bar." We decline to sanction them.

## VI. *Conclusion*

When a parent is examining the educational opportunities available for his handicapped child, he may be expected to focus primarily on his own child's best interest. Likewise, when state and local school officials are examining the alternatives for educating a handicapped child, the child's needs are a principal concern. But other concerns must enter into the school official's calculus. Public education of handicapped children occurs in the public school system, a public institution entrusted with the enormous task of serving a variety of often competing needs. In the eyes of the school official, each need is equally important and each child is equally deserving of his share of the school's limited resources. In this case, the trial court correctly concluded that the needs of the handicapped child and the needs of the nonhandicapped students in the Pre-kindergarten class tip the balance in favor of placing Daniel in special education. We thus

AFFIRM.