**Leonard LISCIO, a minor, by his parent and next friend, Blanche HIPPENSTEEL, and Blanche Hippensteel, Plaintiffs,**

v.

**The WOODLAND HILLS SCHOOL DISTRICT, the Allegheny Intermediate Unit, Thomas Gilhool, Secretary of the Pennsylvania Department of Education, Defendants.**

Civ. A. No. 88–719.

United States District Court, W.D. Pennsylvania.

Aug. 28, 1989.

Edward J. Feinstein, Pittsburgh, Pa., for plaintiffs.

Thomas M. Rutter, Jr., Bryan B. Campbell, Pittsburgh, Pa., for Woodland Hills & AIU.

John R. Anderson, Deputy Atty. Gen., Pittsburgh, Pa., for Secretary of Pa. Dept. of Educ.

## ADJUDICATION

STANDISH, District Judge.

This is a civil action under the Education of the Handicapped Act, 20 U.S.C. § 1400 et seq., and Pennsylvania state law in which plaintiffs Leonard Liscio, a minor, and Blanche Hippensteel, his parent, challenge the educational placement of Leonard, a handicapped child. After a non-jury trial, the court makes the findings of fact and conclusions of law set forth below.

*Findings of Fact*

1. Plaintiffs are Leonard Liscio, a minor, and his parent, Blanche Hippensteel.

2. Defendant Woodland Hills School District (the District) is a governmental unit which administers all public schools within the District.

3. Defendant Allegheny Intermediate Unit (the AIU) is a governmental unit which, in association with the District, administers special education programs and schools to which exceptional children in the District may be placed.

4. Defendant Thomas Gilhool is the Secretary of Education of the Commonwealth of Pennsylvania. As such, he is responsible for the administration and operation of the Pennsylvania Department of Education.[1]

5. Leonard Liscio was born on October 30, 1978. He resides with his mother, Blanche Hippensteel, in the District. For the upcoming 1989–90 school year, he will be in the 5th grade.

6. Leonard has been diagnosed as having the dual handicap of educably mentally retarded (EMR) and socially and emotionally disturbed (SED). He has a history of attention deficit disorder with hyperactivity which is characterized by inattentiveness, difficulty in completing tasks, inability to control drives well and distractibility by irrelevant peripheral stimuli. In addition, Leonard has a mild oppositional disorder which is manifested by stubbornness, a strong will and a tendency to easily get into power struggles with adults. He also has mild epilepsy which is controlled with medication.

7. Eastern Area School is a special education center operated by the AIU within the District. During the 1985–86 and 1986–87 school years, Leonard was placed on a full-time basis in an EMR/SED program at Eastern Area School. This type of program is now designated as a SED/MR class because some children fall within the range who are below the EMR range. Although Eastern Area School teaches children who are severely retarded, it also has students who are higher functioning, socially and academically, than Leonard.

8. For the 1987–88 school year, the District and the AIU reevaluated Leonard and again identified Leonard as having the dual handicap of EMR/SED. It was recom-

---

1. After completion of the presentation of plaintiffs' evidence, the Secretary of Education moved for an involuntary dismissal under Fed. R.Civ.P. 41(b). Specifically, the Secretary maintained that dismissal of plaintiffs' complaint against him was warranted due to the absence of a case or controversy with respect to the Secretary. Based on the evidence offered at trial, there is no basis for granting any relief against the Secretary. Accordingly, by separate order, the motion of the Secretary to dismiss plaintiffs' complaint will be granted.

mended that Leonard continue his full-time educational placement in the SED/MR class at Eastern Area School. Mrs. Hippensteel objected to this recommendation because it did not provide for any interaction between Leonard and his nonhandicapped peers. Leonard's extracurricular activities with nonhandicapped peers include Cub Scouts, football and ballet classes. He does well in these social activities and enjoys the interaction with nonhandicapped children. Therefore, Mrs. Hippensteel requested that Leonard be placed in an EMR classroom in a regular District school to enable Leonard to be mainstreamed with his nonhandicapped peers.[2] The AIU operates an EMR class for children of Leonard's age and intellectual functioning at Ben Fairless School in the District. Nonhandicapped students, as well as handicapped students, attend Ben Fairless School.

9. Pursuant to the Education of the Handicapped Act, 20 U.S.C. § 1400 *et seq.,* (the EHA) and Pennsylvania state law, 22 Pa.Code § 13.31 *et seq.,* Mrs. Hippensteel invoked the due process procedures established by those laws and requested a prehearing conference.

10. The prehearing conference was held on June 17, 1987. The District and the AIU offered to integrate Leonard into an EMR class in Ben Fairless School for one period per week. Under this proposal, integration would be increased gradually with a projection of 50% integration by January of 1988, depending on Leonard's progress. Mrs. Hippensteel rejected this proposal and requested a due process hearing pursuant to the EHA and Pennsylvania state law. The District and the AIU invoked the "stay put" provisions of the EHA which resulted in Leonard's full-time placement in the

SED/MR class at Eastern Area School during the pendency of the due process hearing.[3]

11. On January 11 and February 1, 1988, a due process hearing was conducted by a special education hearing officer to determine the appropriate educational placement for Leonard. Thereafter, on February 25, 1988, the hearing officer issued a decision in which he determined that Leonard's appropriate placement in the least restrictive environment was a transition from the SED/MR class at Eastern Area School to an EMR class in a regular District school. The hearing officer recommended that Leonard initially be assigned to the District-based EMR class for at least two periods per day and lunch or recess. Eventually, it was hoped that Leonard would be placed in a District-based EMR class on a full-time basis. Further, the hearing officer recommended that a Multi-Disciplinary Team (MDT) meet weekly to monitor Leonard's progress and to provide a support system for Leonard.

12. The District and the AIU did not appeal the findings of the hearing officer. However, Mrs. Hippensteel filed exceptions to the hearing officer's decision with the Secretary of Education. Specifically, Mrs. Hippensteel objected to the recommendation that Leonard be required to attend classes at both schools during the transitional period.

13. On August 11, 1988, the Secretary of Education issued a decision ordering the District and the AIU to place Leonard in a District-based EMR class on a full-time basis; to hire an aide to assist Leonard in moving about the building; to train all staff who would have contact with Leonard in the techniques referred to in Leonard's Individualized Education Program (IEP)[4]

---

**2.** There are no SED/MR classes in any regular schools within the District because of the low incidence of children with this dual handicap. In the entire District, there are only 17 children who have the dual handicap of EMR/SED between kindergarten and age 21.

**3.** 20 U.S.C. § 1415(e)(3).

**4.** Section 1401(a)(19) of the EHA defines an IEP as "a written statement for each handicapped

child developed in any meeting by a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of handicapped children, the teacher, the parents or guardian of such child, and, whenever appropriate, such child, which statement shall include—

    (A) a statement of the present levels of educational performance of such child,

and in the nature of Leonard's handicap, particularly as to how Leonard may differ from other students in the proposed class; to orient the non-exceptional student population in regard to matters involving Leonard's placement and to meet weekly to assess Leonard's progress.

14. On September 30, 1988, plaintiffs filed a motion for a preliminary injunction seeking to enjoin the District and the AIU from failing to place Leonard in a District-based EMR class on a full-time basis. After hearing, the motion was denied on October 6, 1988.

15. Thereafter, the District and Mrs. Hippensteel agreed on an interim placement of Leonard during the pendency of this case. Pursuant to this agreement, Leonard has attended an EMR class at Ben Fairless School for two periods per day in the morning since October 11, 1988. In addition, Leonard has been mainstreamed at Ben Fairless School for such classes as homeroom, physical education, library, music and art. Leonard spends the remainder of his school day attending the SED/MR class at Eastern Area School.

16. Dr. Claire Cohen, a child, adolescent and adult psychiatrist, initially evaluated Leonard in December, 1987, at his mother's request, to make a recommendation respecting Leonard's educational placement. At that time, Dr. Cohen concluded that her diagnosis of Leonard's handicap did not preclude placement in a regular school and recommended that Leonard be placed in an EMR class in a District-based school. In addition to capability, Dr. Cohen noted that Leonard was highly motivated to be mainstreamed with his nonhandicapped peers. However, due to Mrs. Hippensteel's request for a due process hearing, and the invocation of the "stay put" provisions of the EHA by the District and the AIU, Leonard remained in the SED/MR class at Eastern Area School.

17. Dr. Cohen saw Leonard again in September, 1988, the beginning of the new school year. Mrs. Hippensteel was concerned about the deterioration of his behavior. Leonard was exhibiting signs of sleep disturbance, anger, frustration, decrease in appetite and gastrointestinal problems. He called his mother "dumb" due to her inability to have him placed at Ben Fairless School. In Dr. Cohen's office, he threw the school bus toy, but no other toy, and expressed concern about going to jail for refusing to go to school. Dr. Cohen diagnosed Leonard's condition as an adjustment disorder with anxious mood, resulting from stress in his environment. She termed the diagnosis "situational" and short term, rather than a chronic illness. Leonard's condition did not change Dr. Cohen's opinion regarding the appropriateness of his placement in an EMR class in a District-based setting. She determined that the stressor itself was the denial of Leonard's placement in Ben Fairless School. Dr. Cohen criticized the proposal of the District and the AIU to begin partial integration of Leonard in the EMR class at Ben Fairless School with only one period per week. Rather, Dr. Cohen believed that Leonard's integration should be much quicker.

18. Shortly thereafter, on October 11, 1988, Leonard began the agreed upon interim placement in the EMR class at Ben Fairless School for two periods in the morning. In addition, Leonard was mainstreamed for physical education and library at this time. The placement appeared to work well for several weeks. However, Leonard believed that he would get additional classes at Ben Fairless School and became frustrated when such an increase did not occur. In December, 1988, Mrs. Hippensteel took Leonard to see Dr. Cohen because he was still frustrated over the school situation. Leonard stated that he "hated school" and was clear about his desire to attend Ben Fairless School on a

(B) a statement of annual goals, including short-term instructional objectives,

(C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs,

(D) the projected date for initiation and anticipated duration of such services, and

(E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved."

full-time basis. Dr. Cohen began to see Leonard for therapy on a weekly basis.

19. Dr. Cohen criticized the District and the AIU for beginning Leonard's partial integration with math, the subject which is most difficult for Leonard. Dr. Cohen also criticized the Behavior Modification Plan (BMP) which was being used by Miss Haluska, Leonard's teacher in the EMR class at Ben Fairless School. Dr. Cohen testified that an effective BMP must be clear as to its requirements and as to the consequences for not meeting the criteria. She believed that the BMP in the EMR class at Ben Fairless School was frustrating for Leonard because he did not understand it. Dr. Cohen claimed that Leonard had a clearer sense of when he would be rewarded in the BMP which was utilized by Mrs. Fox, his teacher in the SED/MR class at Eastern Area School, and that it was more encouraging. She maintained that this BMP could be utilized in an EMR class in a District-based setting without a lot of effort.

20. By March, 1989, Leonard's anxiety over his school placement decreased. He was sleeping well and was less angry with the school and his mother. On May 15, 1989, Dr. Cohen observed Leonard in his classes at both schools. Her observations of Leonard in Ben Fairless School included homeroom, music and the EMR math class. While Dr. Cohen described Leonard as a little fidgety in these classes, she stated that he was significantly more disruptive in the SED/MR class at Eastern Area School. This was due, at least in part, to the greater interaction between Leonard and his peers in SED/MR class. Based on these observations, Dr. Cohen concluded that Leonard could adequately perform in a District-based EMR class on a full-time basis due to his demonstrated ability to act appropriately in a mainstream setting. She noted his adequate performance when mainstreamed in the music class at Ben Fairless School which had no formal BMP.

21. Currently, Dr. Cohen feels strongly that Leonard should be placed in the EMR class at Ben Fairless School on a full-time basis. First, she notes Leonard's appropriate behavior in his mainstreamed classes, such as music, with no BMPs in place. Second, Dr. Cohen believes that Leonard has made adequate academic progress in the EMR math class at Ben Fairless School. Finally, Leonard is extremely adamant in his desire to go to school with his nonhandicapped peers on a full-time basis.[5]

22. Dr. Robin Barack, a certified and licensed school psychologist, also testified on plaintiffs' behalf. Dr. Barack was asked to evaluate Leonard in November, 1987 to make a recommendation regarding his appropriate educational placement. Dr. Barack visited Eastern Area School in January, 1988 to observe Leonard. Thereafter, she administered several tests to Leonard. The results were consistent with his previous test scores. His IQ score of 63 is within the EMR range.

23. During testing, Leonard was cooperative and able to separate from his mother. He exhibited some fidgeting and normal signs of anxiety. He showed weaknesses in memory tasks and abstract visual concepts, some difficulty with receptive language ability and higher comprehension when he did not have to do the reading. His test scores showed that math was an area of greater difficulty for Leonard. Dr. Barack's opinion that Leonard had the ability to be mainstreamed in a District-based school was not affected by his test scores. She believed that the offer of one period per week in a District-based EMR class was inappropriate due to her concern that it may cause confusion for Leonard. Dr. Barack was also concerned about Leonard attending the EMR class at Ben Fairless School for two periods per day for the same reason. Further, such arrangement allowed less interaction with Leonard's nonhandicapped peers.

---

5. The evidence at trial indicated that Leonard's desire to attend Ben Fairless School on a full-time basis may be due, in large part, to his mother's influence. The court hopes that Mrs. Hippensteel realizes that her attitude is critical to Leonard's success or failure in any educational program. While the court does not doubt that her intentions are good, they may be unrealistic for Leonard at this time.

24. On November 16, 1988, Dr. Barack observed Leonard in the EMR class at Ben Fairless School. She arrived just before Leonard and met with the aide who was assigned to assist Leonard. Dr. Barack spoke to Leonard's regular homeroom teacher who stated that "Leonard was no problem at all." In his EMR class, she observed two other students who were more disruptive than Leonard. While Miss Haluska was working with a reading group, Leonard was given math problems. Although he did not do the problems, Dr. Barack stated that Leonard was not disruptive. Thereafter, she observed Leonard go to an assembly and listen to a lecture on planes. He behaved appropriately throughout her observation.

25. On November 30, 1988, Dr. Barack observed Leonard in Mrs. Fox's SED/MR class at Eastern Area School. Leonard sat at his desk and did a reading lesson appropriately. Dr. Barack concluded that the SED/MR class at Eastern Area School was more structured and clear. Dr. Barack maintained that this program could be implemented in the EMR class at Ben Fairless School. She felt stronger about Leonard's ability to be placed in an EMR class in a District-based school on a full-time basis after these observations.

26. Dr. Barack stated that she was "appalled" in some ways by the method in which Leonard was mainstreamed in Ben Fairless School. She claimed that there had been little preparation or orientation of teachers and that no BMP had been developed. Dr. Barack asserted that, although mainstreaming had been very poorly done, Leonard still performed adequately. She believed that better progress by Leonard could be expected if some planning were undertaken by the District.

27. Dr. Barack reevaluated Leonard on July 5, 1989. She maintained that Leonard showed significant progress, more than would be expected. Dr. Barack noted that Leonard was being judged primarily on his EMR math class and that this is his weakest subject. Moreover, she believed that his fidgetiness and distractibility did not prevent him from performing satisfactorily and that he was no more disruptive than the other students in the EMR class. She saw no benefit in placing Leonard back in the SED/MR class at Eastern Area School on a full-time basis.

28. Virginia Laverty is the Supervisor of Special Education and Psychological Services for the District. Ms. Laverty is responsible for the educational programming of 1600 exceptional children within the District and supervises the school psychologists. She has participated in Leonard's placement since 1985 and was present during the preliminary injunction hearing in this court in October, 1988. Ms. Laverty was responsible for implementing Leonard's partial integration into Ben Fairless School under the agreed upon interim placement which was reached between the District and Mrs. Hippensteel on Thursday, October 6, 1988.

29. Ms. Laverty wanted the partial integration implemented as expeditiously as possible because Leonard was not attending any school and it was already October. Ms. Laverty called Mr. Marino, principal of Ben Fairless School, immediately. In turn, he informed the school nurse, homeroom teacher and EMR teacher, Miss Haluska, of Leonard's placement. He also called Mr. Doyle, principal of Eastern Area School. Arrangements were made for Miss Haluska to visit Eastern Area School and meet Leonard's teachers to discuss Leonard's program. Leonard and his mother were to visit Ben Fairless School on Monday and Leonard was to start classes on Tuesday. On Monday, an in-service meeting was scheduled for 3:00 p.m. and everyone who would be working with Leonard on the first day was included. It was arranged for an aide from the SED/MR class to meet Leonard and familiarize him with the school. No orientation for the children in his homeroom or physical education class was arranged, but this was not done for any exceptional children upon mainstreaming. MDT meetings were set for Mondays at 3:00 p.m. to discuss Leonard's functioning within the whole program. The AIU coordinated a meeting for the end of November to formulate an IEP for Leonard. On Tuesday, Mrs. Fox visited Ben Fairless

School to view Leonard's classroom but returned to Eastern Area School in time to greet Leonard upon his arrival.[6] Ms. Laverty called both schools to ensure that everything had gone well on the first day of Leonard's dual placement.

30. The court finds that, contrary to the testimony proffered by plaintiffs' experts, the District and the AIU took considerable measures to ensure that Leonard's orientation into Ben Fairless School went as smoothly as possible considering the extremely short amount of time which they had to implement his partial integration. Moreover, Ms. Laverty has spent forty-one (41) days on Leonard's placement which is disproportionate to the time she has spent on the other exceptional children for which she is responsible.

31. Leonard attended classes at Ben Fairless School in the morning. It was agreed that he should attend Ben Fairless School at the optimum time which is in the morning for most children. However, due to transportation and scheduling problems, Leonard's school day was shortened by approximately one hour. This was a matter of great concern for all involved.

32. During the past school year, Ms. Laverty testified that three EMR students were transferred from center-based schools to District-based schools. Ms. Laverty maintained that the EMR children had no problem with total integration but, with the SED/MR children, it is the SED component which presents problems. Usually, the SED/MR children are partially integrated and, eventually, moved into an EMR class in a regular District school on a full-time basis.[7]

33. Mrs. Celine Fox, Leonard's special education teacher at Eastern Area School, has been employed by the AIU for 14½ years. Mrs. Fox stated that Leonard was comfortable in her class and fit in well with the other students, both socially and academically. Of the twelve students in her class, Leonard and three other students required significant redirection to task, but this was to be expected. He was in her lower group for reading and writing. Leonard has made academic progress over the course of the past school year in Mrs. Fox's classroom. She agrees that mainstreaming benefits Leonard in the area of social skills, but Mrs. Fox claims that such benefits also occur in her classroom.

34. During the past school year, Mrs. Fox made several recommendations for certain exceptional students to be placed in District-based schools for various classes. She also recommended that one student be placed in an EMR class in a regular District school on a full-time basis. However, she would not recommend full-time placement for Leonard in the EMR class at Ben Fairless School at this time.

35. Ms. Barbara Haluska has been a special education teacher for the past 16 years. She is presently employed by the AIU at Ben Fairless School to teach the EMR classes in the 4th, 5th and 6th grade. A BMP was in effect in Ms. Haluska's classroom when Leonard began attending Ben Fairless School on October 11, 1988. The BMP was at a higher level than the one utilized by Mrs. Fox in the SED/MR class at Eastern Area School and was effective with the other EMR students. Ms. Haluska had hoped that Leonard would fit into this BMP with her other students. Ms. Haluska did not feel that it was fair to the rest of her class to lower the level of the BMP in place to accommodate Leonard.

36. Ms. Haluska taught Leonard for one period per day, except Tuesdays, when she taught Leonard for two periods. Leonard was required to do seat work in her classroom. Most of the students in Ms. Haluska's EMR class can work on their own for a substantial part of the period. Over time, Leonard did less work and en-

---

**6.** Mrs. Fox was also a new teacher for Leonard. Mrs. Lewis had previously taught Leonard's SED/MR class at Eastern Area School.

**7.** During the first month of his partial integration, although Leonard was functioning adequately in physical education, he exhibited a high level of distractibility in the EMR class which concerned his teacher, Miss Haluska. At the same time, Leonard worked more positively, both socially and academically, in his SED/MR class at Eastern Area School.

gaged in more inappropriate behavior. Leonard's work continued to deteriorate even though she made it easier. He was disruptive, required much redirection and disturbed other students. He engaged in inappropriate behavior such as walking around, making noises, talking out, ripping papers and playing with items in his desk which ended up on the floor. Further, he was not responsive to one-on-one instruction when she attempted to assist him in finishing his assignments. The other students came to resent Leonard's behavior.

37. On October 20, 1988, Ms. Haluska put in a referral to Dr. Judith Braggins, the school psychologist, to request assistance in dealing with Leonard's deteriorating behavior. They decided to target his most disruptive behavior—speaking out and making noises—and developed a BMP exclusively for Leonard to try to eliminate this behavior. This disruptive behavior was not related to Leonard's fine motor skill delays which Drs. Cohen and Barack testified required Leonard to orally cue himself to keep on task. Rather, it involved full-scale talking and noise unrelated to academic assignments. In November and December, the BMP resulted in a decrease in this disruptive behavior; however, there was a corresponding decrease in the amount of work Leonard completed. At times, he even refused to put his name on his papers.

38. In an attempt to increase his academic progress, a third BMP just for Leonard was implemented by Ms. Haluska after the Christmas holiday. Leonard knew how the BMP worked and what was expected of him. However, by May, 1989, his disruptive behavior had increased again and he made very negative comments about all the work in the class. During this time, Leonard made no friends in the EMR class, and the other students were trying to distance themselves from Leonard. Moreover, Leonard's behavior affected Ms. Haluska's ability to teach the rest of the students in her EMR class. Their train of thought was often interrupted and the lesson had to be restarted several times during the period. In math, Leonard did not master any of the seventeen (17) goals set forth in his IEP.

Ms. Haluska stated that most students master at least a few goals. Leonard also mastered no goals in language and social development. Ms. Haluska believed that Leonard's IEPs reflect goals that are realistic and within his capabilities.

39. It is the opinion of Ms. Haluska that Leonard could not return to the EMR class at Ben Fairless School and perform adequately, either behaviorally or academically. Ms. Haluska firmly disagreed with the suggestion that it was more important for Leonard to interact with his nonhandicapped peers, than to make academic progress.

40. Dr. Judith Braggins, a school psychologist since 1973, testified on behalf of the District and the AIU. She is responsible for 600 to 700 students and provides consultative or direct services for teachers. Dr. Braggins was informed of the litigation surrounding Leonard's placement by Ms. Laverty before he began school in October, 1988. She attended the MDT meetings concerning Leonard from the beginning. At the initial MDT meetings, Ms. Haluska discussed Leonard's significant behavioral problems in her EMR class. After the second or third meeting, a referral was made by Ms. Haluska to Dr. Braggins concerning Leonard's behavioral problems. As stated above, Dr. Braggins worked with Ms. Haluska to develop a BMP for Leonard that would eliminate his most disruptive behavior in class—talking out and making noises. Dr. Braggins was concerned about having two BMPs in effect in one classroom because it can be disruptive to lessons. When asked why Mrs. Fox's BMP from the SED/MR class at Eastern Area School was not implemented, she stated that it was inappropriate to change the BMP which Ms. Haluska had in effect when Leonard was placed in her class because this BMP was working well for the remainder of the students in the EMR class. During December, she noted that Leonard's disruptive behavior decreased, but that he was not keeping up with his academic work. It was decided that a third BMP for Leonard would be implemented after Christmas. Leonard's behavior sig-

nificantly worsened after the holidays, which coincided with his return to Dr. Cohen for therapy. The third BMP was implemented in mid to late January, 1989.

41. Dr. Braggins evaluated Leonard at the end of the 1988–89 school year. Leonard's behavior in both schools was found to be similar. The difference was in the intensity of his oppositional behavior. In the EMR class at Ben Fairless School, he refused to do his work with a greater intensity. In the SED/MR class at Eastern Area School, he could be redirected to task easily. At Eastern Area School, he had two or three friends who greeted him when he arrived at school and with whom he interacted. Dr. Braggins did not see the same type of relationships in the EMR class at Ben Fairless School. Moreover, he never initiated conversations with other students in an appropriate way in the EMR class. The students in the EMR class at Ben Fairless School tended to see Leonard as different from themselves. Although they attempted to ignore his behavior, he still caused a disruption in the classroom.

42. After her evaluation at the end of the 1988–89 school year, Dr. Braggins concluded that Leonard continued to fit into the SED/MR classification; that he had made progress in the SED/MR class at Eastern Area School; and that he was not ready for placement outside of Eastern Area School. She also stated that the personnel at Ben Fairless School worked hard to make Leonard's partial integration a success and that Dr. Barack, apparently, had been misinformed about the preparation undertaken for Leonard's partial integration. Dr. Braggins stated that the time she spent on Leonard's placement was disproportional to the time spent on any other exceptional child during the past school year.

43. An EMR class and a SED/MR class are two very different programs. An EMR class is designed to fulfill the academic needs of cognitively limited children. There are two levels of EMR classes at Ben Fairless School. Leonard was placed in the lower level class. This class is comprised of children with IQ's in the 50–80 range.

The focus of this EMR class is on academics and involves much repetition. The SED/MR class at Eastern Area School is much more structured than the EMR class at Ben Fairless School because the emotional problems of these children can interfere with intellectual functioning and academic progress. While the SED/MR class has a similar academic focus, the primary component is social and emotional development. At times, academics can come second to behavior control. The SED/MR class has the added advantage of sensitivity to the particular problems of SED children.

44. Leonard has made little, if any, academic progress in the EMR class at Ben Fairless School. He has had difficulty completing academic assignments, even when working on a one-on-one basis with his teacher. Further, Leonard has not interacted socially with the other students in the EMR class at Ben Fairless School. In fact, at the year end, his EMR classmates were less compatible with him than they had been earlier in the year.

45. The MDT, comprised of Dr. Braggins, the school psychologist, Ms. Haluska, Leonard's teacher, and other educational professionals familiar with Leonard, has met weekly with few exceptions, since October 17, 1988, to monitor Leonard's progress. In its report dated January 23, 1989, the MDT recommended that it was in Leonard's best interest, academically, that he be returned on a full-time basis to the more structured SED/MR program at Eastern Area School. The team noted that, while Leonard continued to respond productively at Eastern Area School, he has demonstrated academic regression in the EMR class at Ben Fairless School by failing to meet the minimum requirements of the program and by refusing to participate in certain academic activities. The MDT continues to recommend that Leonard be placed on a full-time basis in the SED/MR program at Eastern Area School. In support of this recommendation, the MDT noted that over the course of the last school year Leonard made little improvement, if any, in the area of attention, independent work

skills and social relations, both in the EMR and mainstream classes.

*Conclusions of Law*

46. The purpose of the EHA is set forth in Section 1400(c) which provides:

> It is the purpose of this chapter to assure that all handicapped children have available to them, within the time periods specified in section 1412(2)(B) of this title, a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of handicapped children and their parents or guardians are protected, to assist States and localities to provide for the education of all handicapped children, and to assess and assure the effectiveness of efforts to educate handicapped children.

20 U.S.C. § 1400(c).

In the present case, it is undisputed that Leonard is entitled to a free appropriate public education. However, the parties strenuously disagree as to the appropriate educational placement of Leonard under the mainstreaming requirements of the EHA and Pennsylvania state law.

47. With respect to a State's eligibility to qualify for financial assistance under the EHA, Section 1412 states:

> **§ 1412 Eligibility requirements**
>
> In order to qualify for assistance under this subchapter in any fiscal year, a State shall demonstrate to the Secretary that the following conditions are met:
>
> \* \* \* \* \* \*
>
> (5) The State has established ...
>
> (B) procedures to assure that, to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of

the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily, ...

20 U.S.C. § 1412(5)(B).[8]

48. The District and the AIU have recommended that Leonard be placed in the SED/MR class at Eastern Area School on a full-time basis. The court must determine whether this recommendation satisfies the requirement of the EHA and Pennsylvania state law that Leonard be educated alongside nonhandicapped children to the maximum extent appropriate. Congress created a strong preference in favor of mainstreaming. *See, e.g., Daniel R.R. v. Board of Education,* 874 F.2d 1036, 1044 (5th Cir.1989). However, the requirement of mainstreaming is not absolute.

49. In *Roncker v. Walter,* 700 F.2d 1058 (6th Cir.1983), plaintiff challenged the placement of her retarded son, Neill, under the EHA. Both parties agreed that Neill required special instruction, and that he could not be placed in educational classes with nonhandicapped children. Plaintiff contended, however, that Neill could be provided the special instruction he needed in a setting where he could have contact with nonhandicapped children. The school district contended that Neill could not benefit significantly from mainstreaming and that any minimal benefits would be greatly outweighed by the educational benefits of the county school. Applying an "abuse of discretion" standard, the district could found in favor of the school district. The United States Court of Appeals for the Sixth Circuit held that the district court erred in reviewing the school district's placement under an "abuse of discretion" standard. Rather, *de novo* review of the school district's placement decision was required, with due weight given to state administrative proceedings in reaching its decision. The case was remanded to the district court for further proceedings. In ad-

---

8. Pennsylvania state law also requires mainstreaming those exceptional persons who can profit by an appropriate program of education in a regular class. *See* 22 Pa.Code. § 13.9. Further, Pennsylvania state law provides a priority order of educational placement which requires placement of handicapped school-aged persons in the least restrictive environment. *See* 22 Pa.Code § 13.11(d).

dressing the issue whether the school district had satisfied the mainstreaming requirement of the EHA, the United States Court of Appeals for the Sixth Circuit stated:

> The Act does not require mainstreaming in every case but its requirement that mainstreaming be provided to the *maximum* extent appropriate indicates a very strong congressional preference. (footnote omitted). The proper inquiry is whether a proposed placement is appropriate under the Act. In some cases, a placement which may be considered better for academic reasons may not be appropriate because of the failure to provide for mainstreaming. The perception that a segregated institution is academically superior for a handicapped child may reflect no more than a basic disagreement with the mainstreaming concept. Such a disagreement is not, of course, any basis for not following the Act's mandate. *Campbell v. Talladega City Bd. of Education,* 518 F.Supp. 47 55 (N.D.Ala.1981). In a case where the segregated facility is considered superior, the court should determine whether the services which make that placement superior could be feasibly provided in a nonsegregated setting. If they can, the placement in the segregated school would be inappropriate under the Act. Framing the issue in this manner accords the proper respect for the strong preference in favor of mainstreaming while still realizing the possibility that some handicapped children simply must be educated in segregated facilities either because the handicapped child would not benefit from mainstreaming, because any marginal benefits received from mainstreaming are far outweighed by the benefits gained from services which could not feasibly be provided in the non-segregated setting, or because the handi-

capped child is a disruptive force in the non-segregated setting. Cost is a proper factor to consider since excessive spending on one handicapped child deprives other handicapped children. *See Age v. Bullitt County Schools,* 673 F.2d 141, 145 (6th Cir.1982). Cost is no defense, however, if the school district has failed to use its funds to provide a proper continuum of alternative placements for handicapped children. The provision of such alternative placements benefits all handicapped children.

700 F.2d at 1063.

■ 50. Therefore, in reviewing an educational placement under the EHA, a district court must make an independent determination based on a preponderance of the evidence, giving due weight to the state administrative proceedings.[9] *See also Hendrick Hudson Central School Dist. Bd. of Educ. v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); *Geis v. Board of Educ. of Parsippany—Troy Hills,* 774 F.2d 575 (3d Cir.1985). Applying this standard to the present case, the court concludes that a free appropriate public education in the least restrictive environment requires the placement of Leonard in the SED/MR class at Eastern Area School for academic subjects. Further, the court concludes that the District and the AIU should mainstream Leonard at Ben Fairless School for nonacademic subjects to the maximum extent possible without unduly affecting the entire schedule of 5th grade classes.

51. In *Daniel R.R. v. State Bd. of Education,* 874 F.2d 1036 (5th Cir.1989), parents of a handicapped child brought an action against the school district alleging violation of the EHA. Specifically, the parents maintained that the school district's refusal to place the child in a class of nonhandicapped students violated the EHA.[10] In determining compliance with

**9.** The court recognizes that due deference is to be given to the state administrative proceedings. However, in the present case, such proceedings preceded the partial integration of Leonard into Ben Fairless School on October 11, 1988. Therefore, the transcript of the due process hearing and the opinion of the Secretary of

Education offer little guidance to the court in determining whether the District and the AIU have complied with the mainstreaming requirements of the EHA.

**10.** Although *Daniel* involved a challenge to the failure of a school district to place a handicapped child in a regular classroom, rather than

the mainstreaming requirement, the United States Court of Appeals for the Fifth Circuit stated:

> Ultimately, our task is to balance competing requirements of the EHA's dual mandate: a free appropriate public education that is provided, to the maximum extent appropriate, in the regular education classroom. As we begin our task we must keep in mind that Congress left the choice of educational policies and methods where it properly belongs—in the hands of state and local school officials. Our task is not to second-guess state and local policy decisions; rather, it is the narrow one of determining whether state and local school officials have complied with the Act. Adhering to the language of the EHA, we discern a two part test for determining compliance with the mainstreaming requirement. First, we ask whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child. See § 1412(5)(B). If it cannot and the school intends to provide special education or to remove the child from regular education, we ask, second, whether the school has mainstreamed the child to the maximum extent appropriate. See id. A variety of factors will inform each stage of our inquiry; the factors that we consider today do not constitute an exhaustive list of factors relevant to the mainstreaming issue. Moreover, no single factor is dispositive in all cases. Rather, our analysis is an individualized, fact-specific inquiry that requires us to examine carefully the nature and severity of the child's handicapping condition, his needs and abilities, and the schools' response to the child's needs.

874 F.2d at 1048.

■ 52. The parties offered expert testimony at trial. Plaintiffs' experts, Dr. Claire Cohen and Dr. Robin Barack, after evaluating Leonard and observing him in both schools, recommended that Leonard be placed in the EMR class at Ben Fairless School on a full-time basis. This recommendation was allegedly based on the level of Leonard's disruptiveness in the classroom and on Leonard's academic progress.[11] On the other hand, defendants' experts, Dr. Moises Wodnicki and Dr. Judith Braggins, as well as Leonard's teachers in the EMR class and the SED/MR class, Ms. Haluska and Mrs. Celine Fox, recommended that Leonard's appropriate educational placement is in the SED/MR class at Eastern Area School based on the identical criteria. The court concludes that defendants' evidence is more credible.

53. Defendants have established by a preponderance of the evidence that Leonard is obtaining no benefit at all in his academic subjects in the EMR class at Ben Fairless School. In some areas, Leonard is actually showing academic regression. At the same time, Leonard has shown academic progress in the SED/MR class at Eastern Area School. In *Hendrick Hudson Central School Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the United States Supreme Court was presented with the issue whether a school district had provided a free appropriate public education. The Supreme Court stated:

(iii)

> Implicit in the congressional purpose of providing access to a "free appropriate public education" is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child. It would do little good for Congress to spend millions of dollars in providing access to a public education only to have the handicapped child receive no benefit from that education. The statutory definition of "free appropriate public education," in addition to requiring that States provide each child with "spe-

---

an EMR classroom, the facts are sufficiently analogous to be instructive in the present case.

**11.** As one indication of academic progress, plaintiffs' experts noted that Leonard's CAT scores showed a slight increase in math and language. The court concludes, however, that such increase is statistically insignificant.

cially designed instruction," expressly requires the provision of "such ... supportive services ... as may be required to assist a handicapped child to *benefit* from special education." § 1401(17) (emphasis added). We therefore conclude that the "basic floor of opportunity" provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child. (footnote omitted).

458 U.S. at 200–01, 102 S.Ct. at 3048, 73 L.Ed.2d at 708. It is clear that Leonard received little or no educational benefit from the EMR classes at Ben Fairless School. If the District and the AIU recommended that Leonard continue his placement in the EMR class at Ben Fairless School for academic subjects, they might well be violating the free appropriate public education requirement of the EHA.

■ 54. Further, defendants have established that it is not possible to educate Leonard in an EMR class in a regular District school, even with additional support services, due to the SED component of his dual handicap which requires a highly structured program and a low level BMP. Moreover, based on the low incidence of this dual handicap, it is not feasible to establish a separate class specifically for this dual handicap in a regular District school. Finally, Leonard is disrupting Ms. Haluska's EMR class to such an extent that he is interfering with the education of the remainder of the children in the EMR class. In *Daniel*, with respect to mainstreaming, the United States Court of Appeals for the Fifth Circuit stated:

> Although broad, the requirement is not limitless. States need not provide every conceivable supplementary aid or service to assist the child. *See generally Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690. Furthermore, the Act does not require regular education instructors to devote all or most of their time to one handicapped child or to modify the regular education program beyond recognition. If a regular education instructor must devote all of her time to one handicapped child, she will be acting as a special education teacher in a regular education classroom. Moreover, she will be focusing her attentions on one child to the detriment of her entire class, including, perhaps, other, equally deserving, handicapped children who also may require extra attention. Likewise, mainstreaming would be pointless if we forced instructors to modify the regular education curriculum to the extent that the handicapped child is not required to learn any of the skills normally taught in regular education. The child would be receiving special education instruction in the regular education classroom; the only advantage to such an arrangement would be that the child is sitting next to a nonhandicapped student. (footnote omitted).

874 F.2d at 1048–49.

■ 55. The failure of the District and the AIU to recommend any mainstreaming of Leonard into Ben Fairless School may be a violation of the EHA. In *Daniel*, the United States Court of Appeals for the Fifth Circuit stated:

> If we determine that education in the regular classroom cannot be achieved satisfactorily, we next ask whether the child has been mainstreamed to the maximum extent appropriate. The FHA and its regulations do not contemplate an all-or-nothing educational system in which handicapped children attend either regular or special education. Rather, the Act and its regulations require schools to offer a continuum of services. 34 C.F.R. § 300.551; *Lachman* [*v. Illinois State Board of Education*], 852 F.2d [290] at 296 n. 7 [ (7th Cir.1988) ] (citing *Wilson v. Marana School District No. 6 of Pima County*, 735 F.2d 1178, 1183 (9th Cir. 1984)). Thus, the school must take intermediate steps where appropriate, such as placing the child in regular education for some academic classes and in special education for others, mainstreaming the child for nonacademic classes only, (footnote omitted) or providing interaction with nonhandicapped children during lunch and recess. The appropriate mix will vary from child to child and it may

be hoped, from school year to school year as the child develops. If the school officials have provided the maximum appropriate exposure to non-handicapped students, they have fulfilled their obligation under the EHA.

874 F.2d at 1050.

The evidence at trial established that Leonard benefits from his interaction with non-handicapped peers in extracurricular activities and enjoys such interaction. Further, it appears that Leonard performed satisfactorily in his mainstreamed classes at Ben Fairless School, such as homeroom, physical education, music, library and art. Moreover, Leonard was not a behavioral problem in these classes, even in the absence of any BMP. Under the circumstances, the court concludes that the District and the AIU must explore the feasibility of mainstreaming Leonard into Ben Fairless School for nonacademic subjects to comply with the requirements of the EHA. At the same time, however, the court does not believe that the EHA requires the District to totally revamp its schedule of 5th grade classes for the benefit of one student. Nevertheless, the court is certain that the District and the AIU will make a good faith effort to mainstream Leonard to the maximum extent possible.

An order consistent with the foregoing findings of fact and conclusions of law was filed on August 24, 1989.