Christy GREER, by and through her father as next friend Gary GREER, Gary Greer, Plaintiffs–Appellees,

v.

ROME CITY SCHOOL DISTRICT, Rome City Board of Education, Larry B. Atwell, Dr., in his Official Capacity as Superintendent of Schools, Defendants–Appellants.

No. 90–9140.

United States Court of Appeals, Eleventh Circuit.

Dec. 26, 1991.

---

690

Sam S. Harben, Jr., Harben and Hartley, Gainesville, Ga., J. Anderson Davis, Brinson, Askew and Betty, Rome, Ga., for defendants-appellants.

Jonathon A. Zimring, Zimring & Ellin, Atlanta, Ga., for plaintiffs-appellees.

Before ANDERSON, Circuit Judge, CLARK *, Senior Circuit Judge, and BROWN **, Senior District Judge.

---

* See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable Wesley E. Brown, Senior U.S. District Judge for the District of Kansas, sitting by designation.

1. Christy also sought relief pursuant to section 504 of the Rehabilitation Act of 1973, 29 U.S.C.

CLARK, Senior Circuit Judge:

Christy Greer is a handicapped child. She brought this action, through her father, against her local school district contending that it had failed to comply with the Education of the Handicapped Act, 20 U.S.C. §§ 1400–1485 (now known as the "Individuals with Disabilities Education Act" pursuant to an amendment effective October 1, 1990).[1] The Greers contend that the Individualized Education Program (IEP) prepared by the school district for Christy is inappropriate because it provides for her placement in a self-contained special education class at a school other than her neighborhood school, rather than in a regular class with nonhandicapped students at her neighborhood school. The issue before us is whether the school district's proposed placement of Christy, pursuant to the IEP, violates the requirement of the Act that handicapped children be educated in the "least restrictive environment," that is, that they be educated to the maximum extent appropriate with children who are not handicapped.

## I.

Christy Greer is a ten year old girl with Down's Syndrome. She lives with her parents in the Rome City School District. In 1986, when Christy was five, her parents first sought to enroll her in the kindergarten program at Elm Street Elementary School, her neighborhood school, for the 1986–87 school year. Christy's mother noted on the school registration form that Christy had Down's Syndrome and several resulting disabilities, including speech and learning disabilities. The school district sought to evaluate Christy, but her parents resisted. They were under the impression

§ 794. The district court found it unnecessary to address this claim, as it entered judgment for Christy pursuant to the Education of the Handicapped Act. We affirm the district court and, therefore, need not address the § 504 claim.

that the outcome of the evaluation was predetermined and would inevitably lead to placement of Christy in a segregated special education program at a school other than Elm Street. When the school board insisted on an evaluation, Christy's parents decided not to enroll her in school for the 1986–87 year and to work with her at home to get her ready for kindergarten.

Christy's parents brought her back to Elm Street in 1988, when she was seven, for enrollment for the 1988–89 school year. The school district again sought to evaluate Christy, and her parents again resisted. The school district then initiated administrative proceedings to compel the Greers to allow Christy to be evaluated. During the pendency of the administrative proceedings, Christy attended the regular kindergarten class at Elm Street.

On August 30, 1988, a hearing was conducted before a regional hearing officer to determine whether Christy should be evaluated. After hearing the evidence, the regional hearing officer rendered a decision in favor of the school district, and the state hearing officer affirmed this decision. Accordingly, Christy was evaluated on December 16, 1988 and January 5, 1989 by a psychologist and a psychometrist, both of whom were employees of the Georgia Department of Education. They concluded that Christy functioned like a moderately mentally handicapped child and that she had significant deficits in language and articulation skills. They recommended "special education services in the areas of speech/language and mentally handicapped" and "an educational setting that affords highly individualized instruction which utilizes multisensory teaching strategies." [2]

On January 23, 1989, the school district convened a placement meeting to discuss the evaluation, develop an Individual Education Program (IEP) for Christy, and make a placement decision. Present at this meeting were the school district's special education director, Christy's regular education kindergarten teacher, the psycholo-

gist and psychometrist who had evaluated Christy, a speech/language pathologist, a special education teacher, the Elm Street School principal, and Christy's parents. The school district presented Christy's parents with a proposed IEP for Christy, which had been drawn up by school officials prior to this meeting. School officials explained to Christy's parents that she required more attention than other children in the regular kindergarten class, that she was not keeping up with the kindergarten curriculum, and that she required repeated rehearsal and practice of basic skills in an individualized setting. The school psychologist expressed his belief that, although Christy may make some progress in a regular kindergarten class, she would make more progress in a special education class. In support of his belief, the psychologist explained that special education teachers were specifically trained to work with children like Christy, but he did not give any concrete examples of other children like Christy who had progressed in special education.[3] The school district proposed placing Christy in a self-contained special education class, that is, a class attended only by mentally handicapped children. The self-contained class was located at Southeast Elementary School, which also had classes for nonhandicapped children. In addition to instruction in the self-contained class, the IEP proposed by the school district for Christy provided for speech therapy and for some activities with nonhandicapped kindergarten children at Southeast, specifically, physical education, music, and lunch. Christy's parents disagreed with the school district's proposed placement and requested time to review the school district's proposal. The meeting was adjourned until February 8, 1989.

Between the January 23rd meeting and the February 8th meeting, Christy's parents had her independently evaluated by a psychologist in private practice in Rome, Georgia. This evaluation was generally consistent with that performed by the

---

**2.** *See* Defendants' Trial Exhibit 23, Psychoeducational Evaluation.

**3.** *See* Defendants' Trial Exhibit 32 at 94–96.

school district, except that the psychologist believed that Christy's I.Q. score was depressed by a possible attention disorder and by her unintelligible speech. The psychologist also expressed his concern over placing Christy in a self-contained special education class:

> I share your concern that if Christy is placed in some type of self-contained special education class that she will not have those peer models to imitate and therefore will not be intellectually stimulated and will be cheated of the opportunity to cognitively stretch herself to the limits.[4]

Christy's parents presented this independent evaluation to school officials when the placement committee meeting reconvened on February 8, 1989. School officials reviewed the evaluation, but declined to make any adjustments to the proposed IEP or to their proposed placement of Christy. Christy's parents rejected the school district's proposal, suggesting that Christy remain in a regular kindergarten class, with that instruction supplemented by some speech therapy. The school board rejected the parent's proposal. Thus, the parties reached a stalemate.

It is significant that neither the transcripts and minutes of the placement committee meetings nor the proposed IEP indicate that school officials considered any options other than the two extremes presented by the parties, that is, the school district's proposal for instruction in a self-contained class and the parents' proposal for instruction in a regular class supplemented only by speech therapy. Indeed, the minutes of the February 8, 1989 meeting, which were prepared by the school district, read as follows:

*OPTIONS CONSIDERED—ACCEPTED/REJECTED/REASONS:*

1. Remain in regular ed program with no special education services.
2. Remain in regular education class receiving only speech services, as per parents' recommendation.
3. Receive special education services in the self-contained class for mentally

handicapped children. And, receive speech-language services. Mainstream for regular ed activities of PE, lunch, music, assembly. Revise IEP, as needed, to indicate an increase in mainstreamed time for any period in which she could participate successfully within regular program.[5]

Thus, there is no indication that, in developing the IEP and Christy's proposed placement, the school district considered the option of Christy remaining in a regular education class with supplemental services such as a resource room, itinerant instruction by an instructor who travels from classroom to classroom, or curriculum adjustment. The only supplemental service that the school district appears to have considered is speech therapy.

Following the February 8, 1989 meeting, the school district initiated administrative proceedings to obtain review under the Education of the Handicapped Act of its proposed IEP and placement for Christy. On March 6, 1989, the regional hearing officer held an administrative hearing. The special education director testified on behalf of the school system that, in her opinion, Christy could not make progress in the regular class at Elm Street Elementary and could make the most progress in the self-contained special education class at Southeast Elementary. She did not testify as to what options the school district considered before reaching this conclusion. When asked about the possibility of implementing the goals of the Christy's IEP in a regular class with supplemental aids and services, the director replied:

> What would prohibit it is I do not believe that's appropriate.
>
> .    .    .    .    .
>
> We simply did not feel like that would meet [Christy's] needs. I don't know a different way to answer that.
>
> We looked at all the information, everything that we learned through the

---

4. Plaintiffs' Trial Exhibit 13 at 4.

5. Defendants' Trial Exhibit 31 at 2.

entire system process, and we did not feel like she could benefit from it.[6]

The school district offered no evidence that it considered whether Christy could be educated in a regular class with the aid of some supplemental services in addition to the speech therapy.

The regional hearing officer rendered a decision in favor of the school district, finding that Christy could not progress in regular kindergarten, that the school district's proposed placement gave her the most opportunity for progress, and that the placement met the requirements for a free appropriate public education. On appeal, the state hearing officer affirmed this decision, thereby upholding the school district's proposed IEP and placement as proper under the Act.

Christy's parents then filed this action in the district court on July 10, 1989. At that time, Christy had spent one year, the 1988–89 school year, in a regular kindergarten class at Elm Street Elementary without the assistance of any supplemental aids or services. She remained in this regular kindergarten class during the pendency of this litigation, through the 1989–90 and 1990–91 school years. The school district implemented speech therapy services for Christy at Elm Street during the 1989–90 school year.

The district court held a bench trial in August 1990. Although the proposed IEP was more than a year and a half old at that time, the school district apparently made no attempt to develop a new one. Accordingly, the issue litigated and determined by the district court was whether the proposed IEP and the proposed placement of Christy in a self-contained class at Southeast Elementary, as applied to school years 1988–89, 1989–90, and 1990–91, complied with the Education of the Handicapped Act.

At trial, the special education director testified for the first time that the placement committee had considered providing supplemental aids and services in the regular classroom for Christy. She testified that this was not a viable option because the goals of the IEP could not be met in a regular classroom.[7] She admitted, however, that these considerations were not reflected in the transcripts or minutes of the placement committee meetings, noting for the first time, and apparently in defense of her position, that "it was very clear that Christy's cognitive functioning level ... is a severe impairment."[8] The parties presented conflicting expert testimony as to whether Christy could be satisfactorily educated in a regular classroom with supplemental aids and services, as opposed to a self-contained special education classroom. The evidence clearly established, however, that Christy had made academic progress during the two years she had spent in kindergarten. It also established that Christy was no longer unusually disruptive in the regular classroom and no longer required a disproportionate amount of the teacher's attention.

After hearing the evidence, the district court determined that the school district, with the appropriate use of supplemental aids and services, could adequately educate Christy in the regular kindergarten classroom, at least for the immediate future. 762 F.Supp. 936. Thus, the district court held that, although the proposed IEP represents an adequate "free appropriate public education," the IEP placement of Christy in a self-contained special education class at Southeast Elementary is not in compliance with the Act because it does not provide placement for Christy in the "least restrictive environment." The district court entered judgment in favor of the Greers and noted that the parties "are encouraged to reconvene an IEP meeting and discuss Christy's placement in terms of the Court's findings." This appeal followed.

## II.

Before the parties filed their appellate briefs, we raised *sua sponte* whether we have jurisdiction. The school district

---

6. Transcript of March 6, 1989 administrative hearing at 79, 82.

7. R4 at 83–86, 97–98.

8. *Id.* at 135.

contends that we have jurisdiction pursuant to 28 U.S.C. § 1291, which provides that courts of appeals have jurisdiction of appeals from all final decisions of the district courts. A district court order is not final and, therefore, is not appealable pursuant to section 1291 if it does not dispose of all of the plaintiff's prayers for relief.[9] In this case, the Greers sought declaratory and injunctive relief, reimbursement of the costs of educational services and independent evaluations provided for Christy by her family, compensatory education services to compensate for services that were improperly delayed, and attorney's fees and costs. In its order, the district court addressed only the request for declaratory and injunctive relief; it did not dispose of the Greers' claims for reimbursement and compensatory education services.[10] Consequently, we do not have jurisdiction of this appeal pursuant to 28 U.S.C. § 1291 because the district court's order is not final within the meaning of that statute.[11]

■ We do, however, have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1). This statute provides that courts of appeals have jurisdiction of appeals from interlocutory orders of the district courts granting or refusing injunctions. An interlocutory order may be immediately appealable pursuant to section 1292(a)(1) if the order has the "practical effect" of granting or denying an injunction, even if the order does not "in terms" grant or deny the injunction, and the order is of " 'serious, perhaps irreparable, consequence' " such that it can be " 'effectually challenged' only by immediate appeal."[12] The district court's order in this case meets this two-part test. First, although the order does not "in terms" grant or deny the Greers request for injunctive relief, it does have the "practical effect" of granting injunctive relief in that it effectively enjoins the school district from relying on or implementing the IEP it developed for Christy. Second, the order is of "serious, perhaps irreparable, consequence" in that it involves the determination of the appropriate education for Christy, a determination that has already been too long delayed. Accordingly, we exercise jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## III. A.

The Education of the Handicapped Act, which provides federal money to assist state and local agencies in educating handicapped children, conditions funding upon compliance with its provisions.[13] To qualify for funds, a state must have "in effect a policy that assures all handicapped children the right to a free appropriate public education."[14] This "free appropriate public education" must be "tailored to the unique needs of the handicapped child by means of an 'individualized educational program' (IEP)."[15] The IEP is developed at a meeting among qualified school officials, the child's teacher, the child's parents or guardians, and, when appropriate, the

9. *See Liberty Mutual Insurance Co. v. Wetzel,* 424 U.S. 737, 742–44, 96 S.Ct. 1202, 1206, 47 L.Ed.2d 435 (1976); *Alamo Rent–A–Car, Inc. v. Sarasota–Manatee Airport Authority,* 825 F.2d 367, 369 n. 2 (11th Cir.1987), *cert. denied,* 484 U.S. 1063, 108 S.Ct. 1022, 98 L.Ed.2d 987 (1988).

10. We agree with the parties that the absence of a ruling on the request for attorney's fees does not divest this court of jurisdiction. *See Budinich v. Becton Dickinson and Co.,* 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988) (claims for attorney's fees are always collateral to the merits and, therefore, a judgment that resolves everything except fees is immediately appealable).

11. The school district contends that the Greers abandoned their claim for reimbursement because they presented no evidence of expenses at trial. We leave it to the district court to determine whether the Greers' remaining claims for relief have been abandoned.

12. *Carson v. American Brands, Inc.,* 450 U.S. 79, 83–84, 101 S.Ct. 993, 996–97, 67 L.Ed.2d 59 (1981) (quoting *Baltimore Contractors, Inc. v. Bodinger,* 348 U.S. 176, 181, 75 S.Ct. 249, 252, 99 L.Ed. 233 (1955)).

13. *Hendrick Hudson Central School District Board of Education v. Rowley,* 458 U.S. 176, 179, 102 S.Ct. 3034, 3037, 73 L.Ed.2d 690 (1982).

14. 20 U.S.C. § 1412(1).

15. *Rowley,* 458 U.S. at 181, 102 S.Ct. at 3038.

child.[16] It must include, among other things, statements of the child's present level of educational performance, annual goals for the child, the specific educational services to be provided the child, and the extent to which the child will be able to participate in regular education programs.[17] School officials must convene a meeting at least annually to review and, when appropriate, revise the IEP.[18] As this court has recognized, "the IEP is more than a mere exercise in public relations. It forms the basis for a handicapped child's entitlement to an individualized and appropriate education."[19] Thus, the importance of the development of the IEP to meet the individualized needs of the handicapped child cannot be underestimated.

In addition to the mandate that all handicapped children be provided with a free appropriate public education, the Act also contains a specific directive regarding the placement of handicapped children. The Act requires the state to establish procedures

> to assure that, to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily....[20]

With this directive, which is often referred to as "mainstreaming" or placement in the "least restrictive environment," Congress created a statutory preference for educating handicapped children with nonhandi-

capped children.[21] Congress also recognized, however, "that regular classrooms simply would not be a suitable setting for the education of many handicapped children."[22] Thus, there is a tension within the Act between two goals: mainstreaming and meeting each child's unique needs. As the Fifth Circuit has said:

> In short, the Act's mandate for a free appropriate public education qualifies and limits its mandate for education in the regular classroom. Schools must provide a free appropriate public education and must do so, to the maximum extent appropriate, in regular education classrooms. But when education in a regular classroom cannot meet the handicapped child's unique needs, the presumption in favor of mainstreaming is overcome and the school need not place the child in regular education.[23]

■ This court has not yet developed a standard for evaluating mainstreaming issues. We look first to *Rowley*, the Supreme Court's seminal case on the Education of the Handicapped Act. In *Rowley*, the Court set out a two-part test to determine whether a child is receiving a free appropriate public education: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive education benefits?"[24] Although this test is helpful in determining whether a proposed IEP provides a "free appropriate public education," *Rowley* did not involve a mainstreaming issue. Thus, the *Rowley* test assumes that the Act's mainstreaming requirement has been met. Accordingly, we agree with those circuits that have held

**16.** 20 U.S.C. § 1401(a)(19).

**17.** *Id.*

**18.** 20 U.S.C. § 1414(a)(5); 34 C.F.R. § 300.-343(d).

**19.** *Doe v. Alabama State Department of Education,* 915 F.2d 651, 654 (11th Cir.1990).

**20.** 20 U.S.C. § 1412(5)(B).

**21.** *See Rowley,* 458 U.S. at 181 n. 4, 102 S.Ct. at 3038 n. 4.

**22.** *Id.*

**23.** *Daniel R.R. v. State Board of Education,* 874 F.2d 1036, 1045 (5th Cir.1989).

**24.** *Rowley,* 458 U.S. at 206–07, 102 S.Ct. at 3051 (footnotes omitted).

that the *Rowley* test was not intended to decide mainstreaming issues.[25]

■ Although the Supreme Court has not articulated a test applicable to mainstreaming issues, the language of the Act itself provides guidance. The Fifth Circuit, adhering closely to the language of the Act, articulated a two-part test for determining compliance with the mainstreaming requirement:

> First we ask whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily. *See* § 1412(5)(B). If it cannot and the school intends to provide special education or to remove the child from regular education, we ask, second, whether the school has mainstreamed the child to the maximum extent appropriate. *See id.*[26]

Because this test adheres so closely to the language of the Act and, therefore, clearly reflects Congressional intent, we adopt it. Like the Fifth Circuit, we hold that no single factor will be dispositive under this test. "Rather, our analysis is an individualized, fact-specific inquiry that requires us to examine carefully the nature and severity of the child's handicapping condition, his needs and abilities, and the schools' response to the child's needs." [27]

■ The case before us turns on the first part of the two-part test: whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily. To resolve this issue, we must examine whether the school district has taken steps to accommodate the handicapped child in the regular classroom.[28] The regulations promulgated pursuant to the Act require school districts to provide a "continuum of alternative placements ... to meet the need of handicapped children...." [29] The continuum required must:

Make provision for supplementary services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placement.[30]

The Act itself mandates that a handicapped child be educated in the regular classroom *unless* such education cannot be achieved satisfactorily with the use of supplemental aids and services. Thus, before the school district may conclude that a handicapped child should be educated outside the regular classroom, it must consider whether supplemental aids and services would permit satisfactory education in the regular classroom. The school district must consider the whole range of supplemental aids and services, including resource rooms and itinerant instruction, for which it is obligated under the Act and the regulations promulgated thereunder to make provision. Only when the handicapped child's education may not be achieved satisfactorily, even with one or more of these supplemental aids and services, may the school board consider placing the child outside of the regular classroom.

■ We emphasize here that the school district's consideration of whether education in the regular classroom may be achieved satisfactorily with supplemental aids and services must occur *prior to and during* the development of the IEP. We have underscored the importance of the development of the IEP. It is during this developmental process that school officials should consider the full range of supplemental aids and services that may be provided in conjunction with regular classroom education, and they should share these considerations with the child's parents at the IEP meeting. It is not sufficient that school officials determine what they believe to be the appropriate placement for a handicapped child and then attempt to justify this placement only after the proposed IEP is challenged by the child's parents.

25. *See Daniel R.R.,* 874 F.2d at 1045; *A.W. v. Northwest R–1 School District,* 813 F.2d 158, 163 n. 7 (8th Cir.), *cert. denied,* 484 U.S. 847, 108 S.Ct. 144, 98 L.Ed.2d 100 (1987).

26. *Daniel R.R.,* 874 F.2d at 1048.

27. *Id.*

28. *Id.*

29. 34 C.F.R. § 300.551(a).

30. 34 C.F.R. § 300.551(b)(2).

We note several factors that a school district may consider in determining whether education in the regular classroom may be achieved satisfactorily. These factors do not constitute an exhaustive list; they are factors that happen to be applicable to the facts of the case before us.

First, the school district may compare the educational benefits that the handicapped child will receive in a regular classroom, supplemented by appropriate aids and services, with the benefits he or she will receive in a self-contained special education environment. We caution, however, that "academic achievement is not the only purpose of mainstreaming. Integrating a handicapped child into a nonhandicapped environment may be beneficial in and of itself."[31] Accordingly, a determination by the school district that a handicapped child will make academic progress more quickly in a self-contained special education environment may not justify educating the child in that environment if the child would receive considerable non-academic benefit, such as language and role modeling, from association with his or her nonhandicapped peers. If, however, the school board determines that the handicapped child will make significantly more progress in a self-contained special education environment and that education in a regular classroom may cause the child to fall behind his or her handicapped peers who are being educated in the self-contained environment, mainstreaming may not be appropriate. In such a case, mainstreaming may actually be detrimental to the child and, therefore, would not provide the child with a free appropriate public education as mandated by the Act.[32]

Second, the school district may consider what effect the presence of the handicapped child in a regular classroom would have on the education of other children in that classroom. The comments to the regulations promulgated pursuant to the Act provide:

"[W]here a handicapped child is so disruptive in a regular classroom that the education of other students is significantly impaired, the needs of the handicapped child cannot be met in that environment. Therefore regular placement would not be appropriate to his or her needs."[33]

A handicapped child who merely requires more teacher attention than most other children is not likely to be so disruptive as to significantly impair the education of other children. In weighing this factor, the school district must keep in mind its obligation to consider supplemental aids and services that could accommodate a handicapped child's need for additional attention.

Third, the school district may consider the cost of the supplemental aids and services that will be necessary to achieve a satisfactory education for the handicapped child in a regular classroom. As the Supreme Court noted in *Rowley*, Congress did not intend for school districts to furnish "every special service necessary to maximize each handicapped child's potential...."[34] This is not to say that a school district may decline to educate a handicapped child in a regular classroom because the cost of doing so, with the appropriate supplemental aids and services, would be incrementally more expensive than educating the child in a self-contained special education classroom. On the other hand, a school district cannot be required to provide a handicapped child with his or her own full-time teacher, even if this would permit the child to be satisfactorily educated in a regular classroom. The school district must balance the needs of each handicapped child against the needs of other children in the district. If the cost of educating a handicapped child in a regular classroom is so great that it would significantly impact upon the education of other children in the district, then education in a regular classroom is not appropriate.

31. *Daniel R.R.*, 874 F.2d at 1049.

32. *See id.*

33. 34 C.F.R. § 300.552 Comment (quoting 34 C.F.R. part 104—Appendix, Paragraph 24).

34. *Rowley*, 458 U.S. at 199, 102 S.Ct. at 3047.

## B.

With these factors in mind, we now turn to the facts of the case before us to determine whether the school district properly determined that Christy could not be satisfactorily educated in a regular classroom. Because we find that the school district failed to meet this first part of the two-part test applicable to mainstreaming issues, we need not reach the second part of that test.

As noted above, the critical inquiry is whether the school district took steps *during the development of the IEP* and placement proposal to accommodate Christy in the regular classroom; we will not consider after-the-fact justifications for a predetermined placement. Our review of the record convinces us that the school district, during the development of the IEP, did not take steps to accommodate Christy in the regular classroom. First, school officials failed to consider the full range of supplemental aids and services, including resource rooms and itinerant instruction, that could be provided to assist Christy in the regular classroom. The special education director did testify at trial that the officials considered supplemental aids and services; however, she admitted that this consideration was not reflected in the transcripts or minutes of the placement committee meetings, and she justified this absence by stating that it was "very clear" that Christy had a "severe impairment." This statement implies that school officials determined that Christy's "severe impairment" justified placement in a self-contained special education classroom without considering whether Christy could be accommodated, with appropriate supplemental aids and services, in a regular classroom. Indeed, the school district's own minutes of the placement committee meetings indicate that school officials considered only three options for Christy: the regular classroom with no supplemental aids and services, the regular classroom with some speech therapy only, and the self-contained special education classroom. The school district's consideration of only these limited options

does not comply with the mandates of the Act. Second, school officials made no effort to modify the kindergarten curriculum to accommodate Christy in the regular classroom. Although Christy's kindergarten teacher stated at trial that she had made efforts to modify the curriculum, the only fact to which she testified to support this statement is that she and her aide spent extra time with Christy; [35] there apparently was no effort to adjust the kindergarten course material that made up the curriculum. Finally, school officials developed the proposed IEP for Christy prior to the placement committee meetings with Christy's parents. Although the school officials asked for the parents' comments, they did not make a realistic attempt to inform the parents of the range of supplemental aids and services that the school district may be required to provide for Christy. Given these circumstances, Christy's parents' conclusion that Christy's placement was predetermined may not have been unjustified.

Moreover, the school district cannot rely on any of the three factors discussed above to justify its decision to remove Christy from the regular classroom. First, the school district's determination that Christy would receive more benefit from education in a self-contained special education classroom than in a regular classroom is due no deference because school officials failed to consider what benefit she would receive from education in a regular classroom *with appropriate supplemental aids and services*. Indeed, the special education director's testimony at the second administrative hearing that Christy could not make any progress in the regular classroom was undermined by the evidence presented at trial that Christy did make academic progress in kindergarten, especially after the school district began to provide her with speech therapy to supplement her regular classroom education. Second, Christy is no longer unusually disruptive in the regular classroom. And third, the school district made no showing that educating Christy in a regular classroom, with appro-

---

**35.** R4 at 195–96.

priate supplemental aids and services, would be cost-prohibitive.

Thus, we hold that the school district failed to comply with the first part of the two-part test applicable to mainstreaming issues; school officials failed, in developing Christy's IEP and proposed placement, to take steps to accommodate Christy in the regular classroom by considering whether education in that classroom could be satisfactorily achieved with the use of supplemental aids and services. We note that it is not our intention here to invade the deference due school districts in their choice of educational methodologies. As the Supreme Court has noted, this deference is due "once a court determines that the requirements of the Act have been met...."[36] Here, we determine only that school officials did not meet the requirements of the Act; they did not offer evidence that they considered alternative methods for educating Christy.

### C.

This opinion is not determinative of Christy's future education. The school district is bound to abide by the standards set forth herein in all circumstances involving mainstreaming issues under the Act. This opinion does not, however, mandate that Christy's future education take place in a regular classroom. The school district must convene a meeting annually to review and, when appropriate, revise Christy's IEP. In doing so, should the school district comply with all requirements of the Act, including those articulated in this opinion, due deference will be accorded to school officials' choice of methodologies for educating Christy.

### IV.

For the reasons set forth above, the judgment of the district court is AFFIRMED.

36. *Rowley,* 458 U.S. at 208, 102 S.Ct. at 3052.